

# In the Missouri Court of Appeals
## Eastern District

DIVISION ONE

| | | |
|---|---|---|
| SKMDV HOLDINGS, INC., | ) | ED102493 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | St. Louis County |
| vs. | ) | |
| | ) | Honorable Thomas J. Prebil |
| GREEN JACOBSON, P.C., | ) | |
| | ) | |
| Appellant. | ) | FILED: April 12, 2016 |

Green Jacobson, P.C. ("Appellant") appeals from the trial court's judgment on a jury verdict, finding Appellant negligent and liable for the difference between the amount of money the jury believed Appellant's former client, DataVerify, should have received under a contract, and the amount it did receive, based on an admitted error in drafting the contract. We affirm in part and reverse in part.

## I. Background

Appellant, a law firm, represented DataVerify, a mortgage fraud detection company, in its sale to Credit Bureau of Columbus, or CBC. Prior to Appellant's engagement, however, in August 2007, DataVerify and CBC signed a letter of intent memorializing the terms of the sale in the "asset purchase agreement," which provided for a first contingent payment of up to $12 million if certain conditions were met, and a second contingent payment that included a "revenue multiplier" in the formula calculating it.

Through the representation of Appellant, and specifically, Jonathan Andres, an attorney at Appellant's firm, DataVerify signed the final asset purchase agreement, which did not contain any provision for the revenue multiplier in the calculation for the second contingent payment. During trial, Mr. Andres testified that he expressed a view to CBC's attorney that the revenue multiplier needed to be in the contract, but CBC's attorney convinced him that it was adequately covered based on its presence in a corresponding exhibit to the contract. Mr. Andres further testified that he assured DataVerify that the asset purchase agreement would require the use of a revenue multiplier as part of the second contingent payment. Mr. Andres agreed that it had been reasonable for DataVerify to rely on his opinion about the contract at that time.

When the second contingent payment came due three years after the asset purchase agreement was executed, DataVerify requested that CBC pay the $42.1 million it believed was due based on the revenue multiplier. CBC's new president and CEO, Jonathan Price, however, denied that CBC owed DataVerify anything, pointing to their agreement's second contingent payment provision. Moreover, when DataVerify looked for an explanation and advice, Mr. Andres stated that DataVerify agreed to eliminate the revenue multiplier from the deal, and thus, was entitled to nothing under the contract.

DataVerify retained new counsel, Thompson Coburn, to assist in the mitigation of the $42.1 million loss. Given that Mr. Andres was then claiming DataVerify had agreed to eliminate the multiplier from the asset purchase agreement, DataVerify decided to accept CBC's offer to make a second contingent payment of $25 million to DataVerify, rather than take a chance at reforming the contract. Thereafter, DataVerify filed suit against Mr. Andres's firm[1], Appellant, to recover the difference between the amount it should have been paid under the asset purchase agreement – $42.1 million – and the $25 million it was able to recover from CBC. Following a

[1] Mr. Andres was also a defendant in the lawsuit but was dismissed.

2

jury trial, the trial court entered judgment on the jury's verdict and ordered Appellant to pay DataVerify $10.5 million – the difference between the approximately $35 million CBC conceded it would have owed DataVerify if the asset purchase agreement had properly included the revenue multiplier, and the $25 million CBC actually paid DataVerify[2].

Thereafter, the trial court denied Appellant's motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The trial court later filed an amended judgment, specifically ordering that "interest shall accrue under RSMo. § 408.040 on the Judgment at the per annum interest rate of 5.25%." This appeal follows.

## II. Discussion

### A. Submissibility of the case: Points I, II, IV, and V

Appellant raises seven points on appeal. First we will discuss four of Appellant's points which contend that DataVerify, a malpractice plaintiff, cannot recover for its attorney's malpractice unless it proves it could not have further mitigated its damages through subsequent litigation, and likewise, Appellant alleges trial court error in rulings regarding its affirmative defense for submissibility of its case. Point I alleges the trial court erred in denying Appellant's motions for a directed verdict and for judgment notwithstanding the verdict because DataVerify failed to make a submissible case on the element of proximate causation, in that (1) the evidence established that DataVerify elected to settle its claim for reformation of the asset purchase agreement at a substantial discount; (2) through that settlement, DataVerify voluntarily introduced a factor of speculation into the malpractice action in which it sought to recover that discount from Appellant; (3) to make a submissible showing on the element of causation, DataVerify was required to show (a) what would have happened if its reformation claim had

---

[2] DataVerify's name was changed to SKMDV Holdings, Inc., after the sale of its assets, including the name DataVerify, during 2007. For the sake of clarity in this appeal, we refer to the corporation as DataVerify throughout, but the respondent's proper name is SKMDV Holdings, Inc.

3

been tried rather than settled and (b) that in light of that anticipated result, the settlement was necessary to mitigate damages; and (4) DataVerify failed to adduce evidence sufficient to satisfy that submissibility requirement.

Similar to the issue of whether DataVerify could prove proximate causation in Point I, Appellant's second point relates to the submissibility of DataVerify's case. Appellant alleges in Point II that the trial court erred in denying Appellant's motions for a directed verdict and for judgment notwithstanding the verdict because DataVerify failed to make a submissible case on the element of proximate causation, in that (1) DataVerify's President and CEO, Steve Halper, and his "right hand guy" and "head computer guru" with ownership in DataVerify, Mike Moseler, had negotiated the deal between DataVerify and CBC and demanded and obtained the revenue multiplier-based earn-out formula specified in the letter of intent; (2) they both testified that they had read the asset purchase agreement prior to signing it; (3) the consideration clause of the agreement was appropriately one and one-half pages; (4) Mr. Halper and Mr. Moseler both signed the agreement despite the patent omission of the revenue multiplier from that contingent payment formula; and (5) as a matter of law, DataVerify's own negligence thus was the intervening proximate cause of the damage.

In Point IV, Appellant alleges that, in the event this Court concludes that DataVerify presented a submissible case, the trial court erred in overruling Appellant's objections to and in submitting the verdict director (Instruction No. 6) because the submission of the issue of proximate cause did not follow the substantive law. Similar to its first point, Appellant reasons that (1) DataVerify settled its claim against CBC to reform the asset purchase agreement at a substantial discount; (2) through that settlement, DataVerify voluntarily introduced a factor of speculation into the malpractice action by which it sought to recover that discount from

4

Appellant; (3) due to that speculation, Missouri law required DataVerify to establish as part of its proof of causation (a) what would have happened if the reformation claim had been tried rather than settled and (b) that in light of that anticipated result, the settlement was necessary to mitigate damages; (4) the verdict director did not hypothesize either of these essential facts, and thus, did not require the jury to find that DataVerify would have lost its reformation action and that its discounted settlement was necessary to mitigate damages; and (5) the verdict director thus assumed that DataVerify would have lost the reformation action and that it was necessary for DataVerify to settle the reformation claim to mitigate its damages, thereby misstating the substantive law.

Additionally, Appellant's Point V contends that, in the event this Court concludes that DataVerify presented a submissible case, the trial court erred in refusing to give an affirmative converse instruction submitting the issue of whether DataVerify would have prevailed in an action to reform the asset purchase agreement, in that (1) to prove Appellant's negligence proximately caused its alleged damages, DataVerify was required to show (a) that it would not have prevailed if the reformation action was necessary to mitigate damages; (2) the verdict director did not hypothesize this ultimate issue and thus did not require the jury to find that it was necessary for DataVerify to settle the reformation claim at a substantial discount to mitigate its damages; (3) Appellant contested the necessity of the settlement and presented substantial evidence that DataVerify would have prevailed if it had tried the reformation action; (4) an affirmative converse instruction submitting the issue of the necessity of the settlement was proper because the verdict director assumed as true or omitted that disputed ultimate issue and permitted the jury to return a verdict in favor of DataVerify without determining whether the company's settlement was the intervening cause of its alleged damages.

5

## 1.  Standard of Review

The standard for reviewing the denial of Appellant's motions for a directed verdict and for judgment notwithstanding the verdict based on determining whether DataVerify presented a submissible case depends on whether legal and substantial evidence supports each fact essential to liability.  Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454, 456 (Mo. banc 2006).  Substantial evidence is evidence that has probative force upon the issues, and from which the trier of fact can reasonably decide a case.  Meyer v. Purcell, 405 S.W.3d 572, 578 (Mo. App. E.D. 2013).  The evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict.  Id.  The questions of whether evidence is substantial and whether the inferences drawn therefrom are reasonable are questions of law.  Id.  This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion.  Id., citing Giddens v. Kansas City S. Ry. Co., 29 S.W.3d 813, 818 (Mo. banc 2000).  Thus, to make a submissible case, DataVerify was required to present substantial evidence for every fact essential to liability in a legal malpractice case.

Additionally, the standard for our review of a court's refusal to give a proffered verdict director is *de novo*, where the Court evaluates whether the instruction was supported by the evidence and the law.  Ploch v. Hamai, 213 S.W.3d 135, 139 (Mo. App. E.D. 2006).  We will reverse only if the error resulted in prejudice and materially affected the merits of the action.  Id.

## 2.  Legal Malpractice

It is well-settled in Missouri that a plaintiff alleging legal malpractice has the burden of proving the existence of an attorney-client relationship, negligence by the attorney, proximate causation of plaintiff's damages, and damages.  Bryant v. Bryan Cave, LLP, 400 S.W.3d 325,

331 (Mo. App. E.D. 2013) (citing Klemme v. Best, 941 S.W.2d 493, 495 (Mo. banc 1997)). Failure to prove any one of these elements defeats a claim for legal malpractice. Id. Here, the attorney-client relationship and negligence are admitted in Appellant's representation of DataVerify and failure to include the revenue multiplier in the asset purchase agreement, as well as advising its clients to sign the asset purchase agreement when the revenue multiplier was not included. Thus, the issue presented in this appeal addresses the element of proximate causation in a legal malpractice action.

Proximate, or legal, cause is often described as a limitation on liability, absolving those actors whom it would be "unfair" to punish because of the attenuated relation that their conduct bears to the plaintiff's injury. Tompkins v. Cervantes, 917 S.W.2d 186, 190 (Mo. App. E.D. 1996). The most basic formulation of Missouri's proximate cause test is that conduct can constitute the proximate cause of any harm that is its "natural and probable result." Id. This has been described as a "look back" test, in which the naturalness and probability of the result is assessed from the point in time after the injury has occurred. Id. The Missouri Supreme Court has recently acknowledged that this test does contain a measure of foreseeability. Id. Foreseeability's role in the proximate cause analysis is widely understood as a limitation on liability. Id. Moreover, this Court recently set forth the requirements for a submissible case on proximate causation in the specific context of a transactional malpractice claim. In Bryant, this Court stated, "[i]n the context of transactional malpractice, . . . we hold, that a plaintiff must show that an agreement more preferable to the plaintiff likely would have been consummated but for the negligence of the defendant attorney." 400 S.W.3d 325, 340 (Mo. App. E.D. 2013). The Missouri Supreme Court followed with a similar holding that a transactional malpractice plaintiff "must prove that [the other contracting party] would have agreed to the relevant provisions" and

7

that "the result would have been more favorable." Nail v. Husch Blackwell Sanders, LLP, 436 S.W.3d 556, 566 (Mo. banc 2014). Thus, following the Missouri Supreme Court's standard for proximate causation in a transactional malpractice case, this Court must determine whether "substantial evidence" of the unconsummated contract was presented to show that the plaintiff, DataVerify, likely would have consummated a more beneficial agreement but for the negligence of the attorney, Mr. Andres, and his firm, Appellant. See id.

Whether proximate cause exists usually raises a jury question. Coin Acceptors, Inc. v. Haverstock, Garrett & Roberts LLP, 405 S.W.3d 19, 24 (Mo. App. E.D. 2013). A court properly interposes its judgment in this determination when the evidence reveals the existence of an intervening cause which eclipses the role of the defendant's conduct played in the plaintiff's injury. Id. An intervening cause breaks the chain of causation, and courts have found that this doctrine can apply to an attorney malpractice case. Collins v. Missouri Bar Plan, 157 S.W.3d 726, 732 (Mo. App. W.D. 2005). An intervening cause is an affirmative defense, and Appellant bears the burden of proof. Mengwasser v. Anthony Kemper Trucking, Inc., 312 S.W.3d 368, 375-76 (Mo. App. W.D. 2010). This Court will affirm the decision of the trial court to deny motions for directed verdict and judgment notwithstanding the verdict, unless we find "[a]n intervening cause[,]" which "is a new and independent force which interrupts the chain of events initiated by the defendant's negligence in such a significant manner as to become the direct and proximate cause of the plaintiff's damages." Rodgers v. Czamanske, 862 S.W.2d 453, 458 (Mo. App. 1993). For a later cause to intervene sufficiently to cut off another defendant's liability for prior negligence, the later cause must break the chain of events so that "the result is no longer the natural and probable consequence of the primary cause or one which ought to have been anticipated." Love v. Deere & Co., 684 S.W.2d 70, 75 (Mo. App. 1985). If the purported

8

intervening cause occurs in combination or concurrent with earlier negligence, it is not an intervening cause. Buchholz v. Mosby-Year Book, Inc., 969 S.W.2d 860, 862 (Mo. App. 1998); Buck v. Union Elec. Co., 887 S.W.2d 430, 434 (Mo. App. 1994) ("However, the mere existence of an intervening act is not decisive. The intervening act must be a superseding cause that is independent of the original actor's negligence and severs the connection between the original actor's conduct and the plaintiff's injury as a matter of law."). An intervening cause is not foreseeable. See, e.g., Shannon v. Wal-Mart Stores, Inc., 974 S.W.2d. 588, 591 (Mo. App. 1998); Oberkramer v. City of Ellisville, 650 S.W.2d 286, 298 (Mo. App. 1983).

Appellant here argues that DataVerify failed to present a submissible case on the element of proximate causation, that the submission of proximate causation did not follow the substantive law, and that proximate causation had to be established through proof that DataVerify would have lost if it had tried a reformation action, rather than settled it. Appellant contends that the settlement of the claim between DataVerify and CBC created speculation in the malpractice action as well as an intervening cause of the alleged damages. We disagree.

To demonstrate the elements of a transactional legal malpractice case, we find the Bryant case most applicable to the case at hand. There, Mr. Bryant brought a legal malpractice action against the attorneys who prepared his antenuptial agreement with his former wife. 400 S.W.3d 325, 340 (Mo. App. E.D. 2013). The trial court agreed with the defendant attorneys and found that the summary judgment record lacked evidence from which a reasonable jury could find that, but for the attorneys' negligence, the ex-wife would have agreed to certain provisions to establish the required proximate cause between the alleged negligence and Bryant's alleged damages, an increased payment obligation to his ex-wife upon their divorce. Id. at 329-31. Bryant cited no

direct evidence of his ex-wife's intentions from which he developed his personal belief that she would have agreed to the provisions at issue. Id. at 333.

Similarly, in Nail v. Husch Blackwell Sanders, LLP, the plaintiff, Nail, claimed negligence against Husch Blackwell in the attorneys' representation of Nail in a dispute with his former employer over stock options. 436 S.W.3d 556, 558 (Mo. banc 2014). The Missouri Supreme Court cited Bryant and found that, in order for Nail to prove Husch Blackwell's negligent drafting diminished the value of his stock options, he must demonstrate that he would have been better off if Husch Blackwell had drafted the settlement agreement as he argues it should have been drafted. Id. at 566 n.10, citing Donahue v. Shughart, Thomson & Kilroy, P.C., 900 S.W.2d 624, 626 (Mo. banc 1995). Further, the Court found he must prove that, but for the risk of delay that diminished the value of his stock options, he would have realized greater profit. Id.

Here, DataVerify's transactional malpractice case is similar to the cases in Bryant and Nail based on the requirement that the plaintiff prove it would have been better off if the drafting had been performed without negligence by the attorney. Here, DataVerify must prove that, but for Appellant's negligence in representing DataVerify during the asset purchase agreement, an agreement more favorable to DataVerify would have been consummated with CBC. We find sufficient evidence on the record to meet DataVerify's burden. First, undisputed evidence of the letter of intent between DataVerify and CBC, signed August 22, 2007, demonstrated that both sides agreed to contract with terms that included the revenue multiplier in the second contingent payment due to DataVerify. The parties' letter of intent reflected the terms both sides agreed to include in the final asset purchase agreement, and the parties did not subsequently change that agreement. Additional testimony demonstrated that the letter of intent reflected the deal agreed

10

upon by both parties and did not change after it was signed. Whereas Appellant argues DataVerify could have reformed the contract rather than settling with CBC, it does not dispute that the parties agreed to consummate a contract more favorable to DataVerify than the final version of the asset purchase agreement.

Additionally, DataVerify introduced evidence that the terms agreed to by the parties in the letter of intent were more favorable to DataVerify than the terms of the final asset purchase agreement. DataVerify's expert witness testified that Appellant's omission of the revenue multiplier reduced the total value of the deal for DataVerify from $75 million to $20 million. DataVerify's Steve Halper testified that, if the asset purchase agreement had included the revenue multiplier in the second contingent payment provision, it would have entitled DataVerify to a second contingent payment "in excess of forty million dollars." However, without the revenue multiplier, DataVerify was not owed any second contingent payment at all. Thus, based on the negligent omission of the revenue multiplier from the asset purchase agreement, CBC denied any payment to DataVerify pursuant to the second contingent payment provision.

Furthermore, DataVerify introduced evidence that the revenue multiplier was omitted from the second contingent payment provision only as a result of Mr. Andres's negligence. Mr. Andres agreed that it was his responsibility to make sure the asset purchase agreement reflected DataVerify's understanding of the deal, and that he noticed he needed to add some language regarding the multiplier for the second contingent payment when he received a draft of the asset purchase agreement from CBC's counsel. Mr. Andres further acknowledged that, when counsel for CBC refused to add the requested language, he decided it was unnecessary because it was covered in an exhibit, and that he would just move on. When DataVerify's Mr. Halper requested confirmation that the asset purchase agreement included the multiplier, before signing the

11

agreement, Mr. Andres assured him it was "bullet proof." The asset purchase agreement was executed without the revenue multiplier language in the second contingent payment provision. Appellant's expert, former judge Mike Close, testified that "[t]here's no question" that Mr. Andres was negligent in omitting the multiplier, and DataVerify's expert, Steve Blumenthal, an Illinois transactional attorney, similarly testified that Mr. Andres was negligent and breached the standard of care.

Based on this sufficient evidence introduced at trial, we find that DataVerify presented a submissible case on the proximate causation element of its transactional malpractice claim in that DataVerify demonstrated that, but for Appellants' negligence in representing DataVerify during the asset purchase agreement, an agreement more favorable to DataVerify would have been consummated with CBC. Appellant's Point I is denied.

### 3. DataVerify's Settlement with CBC

With an understanding of the law of transactional malpractice and proximate causation, we further review the way in which settlements interface with malpractice claims. Appellant argues DataVerify's settlement with CBC introduced speculation into the malpractice action and also required an additional element of proof that DataVerify show it could not have cured the attorney's malpractice through subsequent litigation in order to establish the attorney's liability for malpractice. In light of the absence of such requirement in the transactional malpractice case law, we disagree.

We find, instead, a transactional malpractice plaintiff is not required to plead or prove that an attorney error could not have been corrected through subsequent litigation. See Bross v. Denny, 791 S.W.2d 416, 419 (Mo. App. W.D. 1990) (proof of the inability to correct the attorney's error through subsequent litigation does not relate to whether a cause of action was

12

stated; the argument that the plaintiff alleging malpractice failed to exhaust her remedies "pertains to damages, not whether a cause of action is stated"). "Mitigation of damages is not a complete bar to recovery, but rather affects the measure of damages that is recoverable." Hurst v. Kansas City, Mo. Sch. Dist., 437 S.W.3d 327, 336-37 (Mo. App. W.D. 2014) (quoting Hertz Corp. v. RASKS Hospitality, Inc., 196 S.W.3d 536, 548 (Mo. App. E.D. 2006)). We agree with DataVerify that its reformation and settlement are irrelevant to the submissibility of the transactional malpractice case against Appellant but, rather, pertain to the calculation of damages.

Settlements do not necessarily preclude damage claims. Collins v. Missouri Bar Plan, 157 S.W.3d 726, 735 (Mo. App. W.D. 2005). Public policy favors settlements, and malpractice victims should not be "completely precluded from . . . settling . . . underlying claim[s]," particularly when the plaintiff can show that settlement was justified. Id. Although a settlement of an underlying lawsuit injects some speculation into a claim for attorney malpractice, it does not preclude a plaintiff from proving malpractice so long as the plaintiff can establish a causal link between the alleged negligence and any loss incurred. Id.; Williams v. Preman, 911 S.W.2d 288, 298 (Mo. App. 1995) (overruled on other grounds by Klemme v. Best, 941 S.W.2d 493 (Mo. banc 1997)). In litigation cases, the plaintiff's obligation is to "prove that the settlement was necessary to mitigate . . . damages," Williams, 911 S.W.2d at 298, or "that plaintiff was driven to the necessity of settling because, if the case had not been settled, plaintiff would have been worse off." Id. at 300. Although Williams does not discuss the evidence required to establish proximate causation in a transactional malpractice case, the Bryant and Nail cases do. As discussed supra, specifically in a transactional malpractice case, a plaintiff must show that the attorney's negligence prevented consummation of a more favorable contract. Bryant, 400

13

S.W.3d at 342; see also Coin Acceptors, Inc. v. Haverstock, Garrett & Roberts LLP, 405 S.W.3d 19 (Mo. App. E.D. 2013).

Even when an injured party "corrects" an attorney's act of malpractice against it, damages may not be altogether eliminated. Beare v. Yarbrough, 941 S.W.2d 552, 556 (Mo. App. E.D. 1997). The party's need to hire new counsel, who would have otherwise been unnecessary, and the expenditure of money for the attorney's fees are some of the damages incurred besides the lost contractual amounts. See Dixon v. Shafton, 649 S.W.2d 435, 438 (Mo. banc 1983). The attorney remains liable for causing damages associated with the client's need to take such corrective action. Beare, 941 S.W2d at 556. In Beare, the defendants contended, essentially, that "one forced to hire a second attorney to obtain damages the first attorney negligently failed to collect from a tortfeasor forfeits any cause of action against the first attorney if the second attorney is ultimately successful in obtaining judgment and collecting it." Id. at 555. This Court rejected such argument and held that even

> where a second attorney successfully accomplishes what the original attorney should have but negligently failed to do, satisfaction of the judgment by the original tortfeasor will never make the client whole for the damages caused by the original attorney's negligence – i.e., interest foregone during the delay in recovery, possible diminution in settlement value, attorney's fees of the second attorney, amounts paid to the first attorney for negligent performance, etc. For the most part, these are elements of damage that are not recoverable from the original tortfeasor.

Id. at 556. Although the case at hand is founded in contract law rather than tort, we find the same principles from Beare can be applied to this transactional malpractice case: there are elements of damage that are not recoverable from the party with whom the contract was originally made. Thus, a settlement to attain the contractual amount of money that should have been paid under the asset purchase agreement, but for the negligence of the first attorney here, does not foreclose a malpractice claim against that first attorney. To prove the damages here,

14

expert opinion provided sufficient evidence that the attorney's negligence prevented consummation of a more favorable contract and DataVerify was worse off than it would have been had Appellant not negligently represented DataVerify in forming the asset purchase agreement with CBC.

We find the court's discussion in Collins instructive to our analysis here as to whether DataVerify presented sufficient evidence that the settlement with CBC was necessary to mitigate its damages. 157 S.W.3d at 730. In the Collins case, expert Judge Connet's testimony established sufficient justification to have survived the attorneys' motion for summary judgment on a malpractice action. 157 S.W.3d 726. The lawsuit arose from the Collinses' consent to the adoption of their son by a Pennsylvania couple, and the attorney advised the Collinses concerning the law during that adoption, assuring them they could withdraw their consent at any time before the adoption was final. Id. at 730. When the Pennsylvania couple gained physical custody of the child, the Collinses attempted to regain custody, seeking leave to withdraw their consent to the adoption. Id. Although the trial court first denied the motion seeking leave to withdraw consent, and this Court affirmed that decision, the Collinses filed another motion to withdraw consent, alleging fraud, misrepresentation and duress. Id. at 731. The trial court dismissed the motion based on estoppel, but this Court remanded the case for a hearing on the issue of fraud and misrepresentation. Id. Then, the parties settled and agreed to joint custody. Id. After the settlement, the Collinses filed the malpractice lawsuit. Id. Expert Judge Connet, who had 30 years' experience with juvenile issues, "specifically predicted that [the Collinses] would have lost [had] the underlying claim . . . not been settled." 157 S.W.3d at 736, citing Williams, 911 S.W.2d at 300. The expert opinion was that that the Collinses may not have been able to regain custody of their child because of the difficulty of showing that removing the child

15

from the adoptive parents' custody was in the child's best interest, and thus, the Collinses settled their case to enjoy joint legal custody and visitation rights. 157 S.W.3d 726.

Here, in viewing the evidence in the light most favorable to the plaintiff, DataVerify produced evidence required to make a submissible case in demonstrating that CBC would have signed the asset purchase agreement with more favorable terms to DataVerify, but for the negligence of Mr. Andres, and that DataVerify properly mitigated its damages by settling with CBC instead of pursuing an action for reformation.

The evidence showed that Mr. Andres advised DataVerify in the fall of 2010 that he did not see the second contingent payment clause in the asset purchase agreement and that soon thereafter, CBC's president and CEO Jonathan Price told DataVerify, "[I]t appears that no payment is due." Mr. Andres then informed DataVerify's Mr. Halper that "you and Mike [Moseler] decided to take the revenue multiplier out of the deal on the final version of the contract," and that he had rejected the suggestion. Mr. Halper instructed Mr. Andres not to talk to anyone about Mr. Andres's position that there was no multiplier in the contract, and then the law firm Thompson Coburn was hired to represent DataVerify. When the attorneys at Thompson Coburn, John Musgrave and John Kingston, met with Mr. Andres and Appellant on October 19, 2010, they left the meeting with the clear impression that the only option was to contact CBC and negotiate the best settlement possible for DataVerify. Mr. Musgrave thought Mr. Andres had clearly reviewed the file and was "unequivocal about it," taking the position that there was no mistake in the asset purchase agreement and offering no hope of reformation. Mr. Musgrave testified that after this meeting, the likelihood of success of a reformation action was "dismal" or "very poor, if existing at all." Instead, the strategy was

> to not emphasize litigation, to not put ourselves in the position of letting CBC
> know what Mr. Andres was saying but to use a business approach to the solution

16

of the problem on a good forward basis with them [Mr. Halper and Mr. Moseler] staying with CBC and continuing to build and grow the company and a business approach.

Thereafter, DataVerify and its new counsel met with CBC's president and CEO, Jonathan Price, as well as CBC's general counsel, Amy Hulthen, to implement the strategy. DataVerify made a bona fide settlement proposal to CBC. CBC made a counter-proposal a few days later for $25 million for the final contingent payment. CBC's outside counsel Mr. Martz was contending then that based on interviews with Paul Fichtman (who was CBC's vice president of business development and participated in the negotiation of the asset purchase agreement) and Kathy Nonnamaker (CBC employee who was a tax advisor), the final asset purchase agreement correctly described the parties' agreements. Mr. Musgrave testified that although there was some back-and-forth between CBC, CBC reached a point of saying it would settle for $25 million, or DataVerify could sue CBC in Ohio.

Mr. Musgrave testified that based on all the circumstances at the time, it was reasonable for DataVerify to make a judgment and accept the settlement. Mr. Musgrave testified:

> [T]he biggest problem we had at the time with reformation lawsuit was still the problem that we always had in the beginning. And that was that the lawyer that was representing these gentlemen in the connection with the drafting and approval of the APA [asset purchase agreement] had told us that they had agreed to take out this multiplier. I don't know how we could have overcome that, quite frankly. I just don't know.

He added that the cost of the lawsuit and time, as well as the disproportionate resources available to DataVerify as compared to CBC also weighed into the decision. CBC's general counsel Amy Hulthen and in-house attorney Tom Wallace were also saying that the revenue multiplier was not part of the deal, as were other people represented by the outside lawyer. Although Wink Price, past president and chief executive officer of CBC, had agreed that he understood the deal to be correctly portrayed in the letter of intent, DataVerify had no indication in its documentation that

17

Wink Price was actually involved in the preparation of the asset purchase agreement. Evidence was also presented that attorney Joseph Von Kaenel, who separately represented Karen Halper, Mr. Halper's wife, in connection with the settlement, also recommended the settlement.

In addition to the assessment by Mr. Musgrave that DataVerify reasonably mitigated its damages by accepting CBC's settlement offer, experts for both parties also testified regarding the necessity of settling with CBC based on the circumstances. Missouri law holds that, except in clear and palpable cases, expert testimony is required to show legal malpractice. Coin Acceptors, Inc. v. Haverstock, Garrett & Roberts LLP, 405 S.W.3d 19, 29 (Mo. App. E.D. 2013). DataVerify's expert witness, Honorable Richard B. McQuade, a retired judge from Ohio with experience in contract reformation, testified that Mr. Andres's position would have been an "[e]xtremely negative" factor in a potential reformation lawsuit. He also reiterated the other factors that lowered DataVerify's chances of succeeding in a reformation case, which included CBC's many employees claiming there was no mistake in the asset purchase agreement and that it correctly reflected the parties' agreement. He pointed out that the asset purchase agreement was prepared by sophisticated counsel for relatively sophisticated businessmen. He noted the presumption that the entire agreement is in the written contract and that, under Ohio law, a plaintiff must prove an action for reformation by clear and convincing evidence. Judge McQuade testified that he "absolutely" would have recommended the settlement and stated, "I can't imagine any lawyer not recommending the settlement under the circumstances."

Appellant's expert, Ohio attorney Mike Close, who was a former trial and appellate court judge, also conceded that Mr. Andres's position would have had a detrimental effect on the reformation case. Although he could not testify as to the amount recommended for settlement,

18

he acknowledged "that it would be appropriate to settle this case at some level" "[r]ather than go to the reformation lawsuit."

Mr. Andres also testified that, to pursue a reformation lawsuit, he would have needed to admit there was a mistake in the contract. However, his position was that DataVerify agreed to eliminate the multiplier from the contract and he denied making a mistake in omitting the revenue multiplier until long after DataVerify voted to accept CBC's settlement offer.

As to the amount of damages, DataVerify's expert witness testified that Mr. Andres's omission of the revenue multiplier reduced the total value of the deal with CBC for DataVerify from $75 million to $20 million. Mr. Halper testified that without the attorney's omission, DataVerify would have been entitled to a second contingent payment "in excess of forty million dollars." Instead, CBC claimed that no second contingent payment was due under the contract based on the omission.

DataVerify made a bona fide attempt to mitigate its damages by settling with CBC and recover the money it could without timely and costly litigation. Experts testified that in light of the information DataVerify had at the time, there was a real possibility that DataVerify would lose a reformation case. Because of that opinion, DataVerify settled for $25 million. DataVerify was not obligated to risk losing everything owed to it by litigating its claim simply because its attorney was negligent. But for the attorney's negligence in omitting the revenue multiplier from the asset purchase agreement, evidence was produced that DataVerify could likely lose more than $40 million that the second contingent payment should have been worth. For these additional reasons, Appellant's Point I is denied.

### 4. Intervening Event

Additionally, regarding Appellant's contention that DataVerify and its own Mr. Halper and Mr. Moseler were negligent, and thus, formed an intervening cause of the damage here, we similarly review the trial court's denial of motions for directed verdicts and JNOV based on this affirmative defense by determining whether the moving party proved the defense as a matter of law; this Court must affirm the decision of the trial court to deny such motions unless the defense was proven as a matter of law and there were no factual issues remaining for the jury to decide. Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 95 (Mo. banc 2010).

In the Collins case, discussed supra, the lawyers who first advised the Collinses and were later accused of malpractice asserted that the second lawyers hired committed negligence, which was an intervening cause that cut off the first attorneys' negligence. 157 S.W.3d at 733. The Court disagreed and held that the "intervening attempt to fix a mistake caused by an earlier party is not necessarily an intervening cause, even when the attempted fix fails." Id. at 732-33. An intervening cause is not foreseeable. Id. at 733. Just as a reasonable person would foresee that a person that he injured would seek a physician's care, the Court held that the Collinses reasonably and foreseeably would seek legal advice after receiving negligent advice. Id.

Here, DataVerify's signing of the asset purchase agreement was not independent of and unrelated to Mr. Andres's negligence, nor was it unforeseeable. Certainly, it was reasonably foreseeable that DataVerify's leadership would take the advice of Appellant and sign the asset purchase agreement once the drafting was complete and Mr. Andres represented to them that the agreement included the revenue multiplier for the second contingent payment. DataVerify's signing of the 53-page asset purchase agreement, a "complex legal document," after obtaining and reasonably relying on this assurance from Mr. Andres, did not interrupt the chain of events triggered by Appellant's alleged negligence. Thus, we find DataVerify's actions are not

20

considered an intervening cause. Appellant did not prove as a matter of law that DataVerify's Mr. Halper and Mr. Moseler acted in a way to establish an intervening cause as an affirmative defense to the negligence of Mr. Andres and Appellant. The trial court properly denied Appellant's motion for directed verdict or JNOV. Appellant's Point II is denied.

### 5. No Instructional Error

In light of our discussion on proximate cause, as well as the reformation and settlement to mitigate damages, we now turn our attention to Appellant's alleged errors in instructing the jury. Appellant's Point IV alleges the trial court erred in overruling Appellant's objections and submitting Instruction No. 6 because the submission of the issue of proximate cause did not follow the substantive law. Appellant also contends in Point V that, in the event this Court concludes that DataVerify presented a submissible case, the trial court erred in refusing to give an affirmative converse instruction submitting the issue of whether DataVerify would have prevailed in an action to reform the asset purchase agreement.

The standard of review in order to reverse on grounds of instructional error is such that the party claiming the instructional error must establish the instruction at issue misdirected, misled, or confused the jury. Sorrell v. Norfolk S. Ry. Co., 249 S.W.3d 207, 209 (Mo. banc 2008). Additionally, prejudice must have resulted from an instructional error. Id., citing Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454, 459 (Mo. banc 2006). Whether a jury was instructed properly is a question of law this Court reviews *de novo*. Hervey v. Missouri Dept. of Corr., 379 S.W.3d 156, 159 (Mo. banc 2012). In determining on appeal whether there was sufficient evidence upon which to base an instruction that was given by the trial court, the evidence must be viewed in the light most favorable to the party at whose request it was given,

21

together with all favorable and reasonable inferences to be drawn therefrom. Young v. New York, C. & St. L. Ry. Co., 291 S.W.2d 64, 67 (Mo. 1956).

Generally, "[w]henever Missouri Approved Instructions [("MAI")] contains an instruction applicable to the facts of a case, such instruction shall be given to the exclusion of any other instructions on the same subject." Rule 70.02(b); Hervey, 379 S.W.3d at 159. Rule 70.02 further provides that departure from an applicable MAI constitutes error, with its prejudicial effect to be judicially determined. Rule 70.02(b)-(c). If a particular MAI does not state the substantive law accurately, it should not be given. State v. Celis-Garcia, 344 S.W.3d 150, 158 (Mo. banc 2011); Spring v. Kansas City Area Transp. Auth., 873 S.W.2d 224, 226 (Mo. banc 1994) ("An instruction must be a correct statement of the law."); Clark v. Missouri & N. Arkansas R.R. Co., 157 S.W.3d 665, 672 (Mo. App. W.D. 2004) ("If an instruction following MAI conflicts with the substantive law, any court should decline to follow MAI"). All the instructions are to be read together as a whole. Yoos v. Jewish Hosp. of St. Louis, 645 S.W.2d 177, 189 (Mo. App. E.D. 1982).

Appellant argues that Instruction No. 6 was erroneous and prejudicial because it relieved DataVerify of its burden of proving an essential element of its malpractice claim – that the settlement was necessary. Appellant argues that the verdict director assumed rather than hypothesized that the settlement was necessary.

Instruction No. 6 directed the jury as follows:

Your verdict must be for plaintiff [DataVerify] . . . if you believe:

First, defendant [Appellant] either:

    Failed to include in the Asset Purchase Agreement a revenue multiplier to reflect the understanding of its client, or

22

Incorrectly advised plaintiff in 2007 that the revenue multiplier was included in the formula for calculating the final contingent payment in the Asset Purchase Agreement, or

Failed to tell plaintiff that the CBC lawyer refused to add the revenue multiplier language to paragraph Section 2.3(e)(ii) of the Asset Purchase Agreement, and

Second, defendant [Appellant] in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff, unless you believe plaintiff is not entitled to recover by reason of Instruction No. 8.

The term "negligence" as used in this instruction means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the legal profession.

The civil MAI for verdict directing when there is no comparative fault is found in MAI 21.01, which reads:

First, defendant (here set out act or omission complained of; e.g., "failed to set plaintiff's broken leg bones in natural alignment," or "left a sponge in plaintiff's chest after performing an operation," or "failed to administer tetanus antitoxin"), and

Second, defendant was thereby negligent, and

Third, as a direct result of such negligence plaintiff sustained damage.

The Notes on Use require a definition for "negligence."

Additionally, MAI 19.01 is the verdict directing modification for multiple causes of damage. It notes that,

In a case involving two or more causes of damage, the "direct result" language of paragraph Third of verdict directing instructions such as 17.01 and 17.02 might be misleading. In such cases, at plaintiff's option, one of the following may be substituted:

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Third, such negligence either directly caused damage to plaintiff or combined with the [acts of (here describe another causing damage) [condition of the (here describe product)] to directly cause damage to plaintiff.

Because the trial court's verdict director, Instruction No. 6, correctly instructed the jury pursuant to these MAI 21.01 and 19.01, it is presumed to be correct. State v. Kelso, 391 S.W.3d 515, 523 (Mo. App. W.D. 2013); State v. Taylor, 238 S.W.3d 145, 148 (Mo. banc 2007). Appellant objected to the verdict director because it did not require DataVerify to "prove a case within a case under the authority of Williams vs. Preman" and submit that DataVerify would have failed to win a reformation action. Appellant's proposed modification misstates the law. As DataVerify argued, and we discussed supra, prevailing in a reformation action had no bearing on the issue of proximate causation in a transactional malpractice action. The trial court thus, did not err in submitting Instruction No. 6 and refusing Appellant's request to modify the verdict director.

Furthermore, Instruction No. 8 provided the jury with the question of mitigation of damages, and followed MAI 32.29 and 4.01. Instruction No. 8 read:

If you find in favor of plaintiff, you must find that plaintiff failed to mitigate damages if you believe:

First, plaintiff failed to pursue contract reformation, and

Second, plaintiff thereby failed to use ordinary care, and

Third, plaintiff thereby sustained damages that would not have occurred otherwise.

The term "ordinary care" as used in this instruction means that degree of care that an ordinary careful person would use under the same or similar circumstances.

Instruction No. 9 further instructed the jury that "[i]f you find that plaintiff failed to mitigate damages as submitted to you in Instruction No. 8, in determining plaintiff's total damages you must not include those damages that would not have occurred without such failure."

MAI 32.29 for failure to mitigate damages states the following:

If you find in favor of plaintiff, you must find that plaintiff failed to mitigate damages if you believe:

First, plaintiff (insert act sufficient to constitute failure to mitigate, such as "failed to return to work"), and

Second, plaintiff thereby failed to use ordinary care, and

Third, plaintiff thereby sustained damage that would not have occurred otherwise.

Additionally, the MAI Notes on Use mandate defining the term "ordinary care." MAI 4.01 on damages further outlines:

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained [and if reasonably certain to sustain in the future] as a direct result of the occurrence mentioned in the evidence. [If you find that plaintiff failed to mitigate damages as submitted in Instruction Number __, in determining plaintiff's total damages, you must not include those damages that would not have occurred without such failure.]

Accordingly, the trial court's instructions conformed to the MAI and correctly stated the law. The trial court did not err in overruling Appellant's objections to, and in submitting the verdict directors given regarding causation and mitigation. Appellant's Point IV is denied.

Furthermore, Appellant's fifth point argues that the trial court erred in refusing to give its affirmative converse instructions, which point is also premised on the belief that DataVefify would have been required to prevail on a reformation action. Appellant submitted two separate proposed affirmative converse instructions at trial, Instruction No. Defendant's C, and Instruction No. Defendant's D, which state the following:

Instruction No. Defendant's C
Your verdict must be for Defendant if you believe Plaintiff would have prevailed in an action to reform the Asset Purchase Agreement and thereby avoided its alleged damages.

Instruction No. Defendant's D

25

> Your verdict must be for Defendant if you believe Plaintiff could have reformed the contract to reflect the understanding of the parties.

Again, we reiterate, "[i]t is basic that it is not error for a trial court to refuse to give a requested instruction which is incorrect." Heming, 509 S.W.2d at 167. Rather than instructing the jury to reduce the damage award if it believed that DataVerify failed to mitigate its damages by not filing an action for reformation, Appellant's proposed converse instructions would have instructed the jury to return a verdict in favor of Appellant if it found such failure to mitigate. This is improper and the trial court did not err in refusing the instruction. See Spencer v. Millstone Marina, Inc., 890 S.W.2d 673, 677 (Mo. App. W.D. 1994). Moreover, "an affirmative converse instruction must submit an hypothesized ultimate issue which, if true, would defeat plaintiff's claim." Oliver v. Bi-State Dev. Agency, 494 S.W.2d 49, 52 (Mo. 1973) (internal quotation marks and citations omitted). An affirmative converse instruction "is not to be used where, as here, there is not an ultimate issue to submit which would defeat plaintiff's claim." Id. at 52. Appellant failed to submit an hypothesized ultimate issue, which, if true, would have defeated DataVerfiy's claim. The trial court did not err in refusing to give Appellant's affirmative converse instructions. Appellant's Point V is denied.

## 5. Conclusion for Points I, II, IV, and V

In sum, sufficient evidence was presented in accordance with the law on transactional malpractice that Appellant proximately caused damages to DataVerify in that, but for the attorney's negligence, DataVerify would have been in a more favorable position and collected more than $40 million for its second contingent payment under the asset purchase agreement with CBC. Instead, it was likely to collect nothing from CBC. The trial court did not err in denying Appellant's motions for directed verdict and for judgment notwithstanding the verdict based on the evidence presented to make a submissible case on the element of proximate cause

26

for transactional malpractice or the affirmative defense of an intervening cause. The trial court also did not err in overruling Appellant's objections to submitting verdict director, Instruction No. 6, or in refusing to give an affirmative converse instruction based on whether DataVerify would have prevailed in a reformation action. Appellant's first, second, fourth, and fifth points are denied.

## B.  Expert Testimony to prove proximate causation – Point III

Still attempting to disprove the element of proximate causation, Appellant's third point alleges the trial court erred in denying Appellant's motions for a directed verdict and for judgment notwithstanding the verdict because DataVerify failed to make a submissible case on the element of causation, in that (1) in an action for legal malpractice, expert testimony on proximate causation is necessary unless the evidence establishing the defendant's negligence as the proximate cause of the plaintiff's damage is "clear and palpable"; (2) in this case there was sufficient evidence to support a finding that either of two intervening causes – Mr. Halper's and Mr. Moseler's execution of the asset purchase agreement after reading it and their decision to settle rather than prosecute the action for reformation of that agreement – was the proximate cause of DataVerify's damages; (3) because there was not clear and palpable proof that Appellant's negligence was the proximate cause, expert testimony was necessary to guide the jury in determining whether DataVerify had proved that element of its case; and (4) transactional attorney, Mr. Blumenthal's causation testimony was relevant to, at most, "but for" causation; misstated Missouri law because it excluded any possibility of an intervening cause after Mr. Andres advised Mr. Halper and Mr. Moseler to sign the contract; and thus provided no legal and substantial expert guidance for jurors to find that negligence attributable to Appellant was the "proximate" cause of DataVerify's loss three years later.

"Expert testimony is required to prove proximate causation in legal malpractice claims, except in a 'clear and palpable' case." Meyer v. Purcell, 405 S.W.3d 572, 578 (Mo. App. E.D. 2013) (citing Steward v. Goetz, 945 S.W.2d 520, 533 (Mo. App. E.D. 1997)). The question of negligence must be clear and palpable to a jury of laymen in order to escape the requirement of expert testimony. Zweifel v. Zenge & Smith, 778 S.W.2d 372, 374 (Mo. App. W.D. 1989). The trial judge is as dependent upon expert testimony as is the jury in a medical malpractice case (again, except in "clear and palpable cases"), so the trial judge sets aside his own legal expertise and becomes the layman. Id. "Thus, the lawyer charged with legal malpractice is in no better position nor in any worse position than the physician charged with medical malpractice . . . . All professionals, for better or for worse, are under the same rule." Id.

In Steward, a half-owner in a building supply firm who had been forced, pursuant to an indemnity agreement for the sale of the firm, to reimburse the purchasers for inventory shortages discovered, brought a fraud action against the other half-owner of the firm, as well as a malpractice claim against the attorney who represented the firm during the sale. 945 S.W.2d 520, 523. This Court determined that the causal link between the acts of alleged legal negligence (failure to advise the client that she was making an unconditional warranty of the accuracy of the firm's financial statements) and the damage (the fact that the co-owner received more money than the plaintiff from the sale of the firm) was not obvious and was not established by other evidence; thus, expert testimony was necessary. 945 S.W.2d at 533.

To contrast Steward, however, the court in Roberts v. Sokol provided that an example of a "clear and palpable" case is where a lawyer allows a statute of limitations to expire on a claim which had been entrusted to him for prosecution. 330 S.W.3d 576, 581 n.4 (Mo. App. S.D. 2011). Also, in Jarnagin v. Terry, expert testimony was not required to prove that an attorney's

28

error in omitting a requested contract term caused a plaintiff's damages. 807 S.W.2d 190, 191-92 (Mo. App. W.D. 1991). There, the court reasoned that in such cases, "the flow of damages to the client, as well as the breach of the professional duty, are subjects of common understanding of jurors." Id.

Here, the causal connection between Mr. Andres's negligent omission of the revenue multiplier and DataVerify's loss was "clear and palpable," just as the attorney's error in Jarnagin, and the flow of damages therefrom was a subject of common understanding to jurors. The evidence showed that Mr. Andres negligently failed to include the revenue multiplier in the second contingent payment for the asset purchase agreement, and that without the multiplier, the second contingent payment was zero. Had Mr. Andres included the revenue multiplier as he should have, the payment due to DataVerify would have been $42.1 million. This loss was "clear and palpable" as it was the subject of common understanding to jurors. Therefore, expert testimony was not required to aid the jurors in understanding that the omission of the contract term proximately caused the loss of value of the second contingent payment.

Moreover, the testimony was sufficient to submit to the jury that DataVerify was damaged by the negligence of Mr. Andres and Appellant. Although not required, DataVerify introduced the expert opinion of Mr. Blumenthal to testify that Mr. Andres had breached the standard of care and was negligent in omitting the revenue multiplier from the second contingent payment provision of the asset purchase agreement. Mr. Blumenthal testified that Mr. Andres's omission of the revenue multiplier for the second contingent payment caused damage to DataVerify. In fact, Mr. Blumenthal said Mr. Andres's negligent act caused damage to DataVerify at the moment Mr. Halper and Mr. Moseler signed the contract. At that point, the asset purchase agreement "effectively capped the amount that the DataVerify clients could ever

29

obtain out of this closing" at $20 million, rather than the $75 million they had negotiated.  Mr. Blumenthal's expert testimony may be relied upon for purposes of determining the submissibility of the case.  See Washington v. Barnes Hosp., 897 S.W.2d 611, 616 (Mo. banc 1995).

The evidence was more than sufficient, both with and without expert testimony, to make a submissible case on the proximate causation element of DataVerify's transactional malpractice claim.  Appellant's Point III is denied.

## C.  Appellant failed to preserve error regarding instruction

In Point VI, Appellant alleges the trial court erred in overruling Appellant's objections to and submitting DataVerify's verdict director (Instruction No. 6) because the first paragraph of that instruction provided the jury with three alternative bases to find that Appellant was negligent and the third alternative was not supported by substantial evidence, in that (1) the third alternative proposed that Appellant had a duty "to tell plaintiff that the CBC lawyer refused to add the revenue multiplier language to paragraph Section 2.3 (e)(ii) of the Asset Purchase Agreement," (2) no evidence was adduced as to the standard of care applicable to a law firm to advise its client of ongoing contract negotiations, and (3) no evidence was adduced that Appellant violated any applicable standard of care by failing to inform DataVerify that CBC's attorney was unwilling to include the revenue multiplier language in Section 2.3(e)(ii) of the asset purchase agreement.

As mentioned previously in discussing the verdict directors, the standard of review in determining whether a jury is properly instructed is a question of law subject to *de novo* review. Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 95 (Mo. banc 2010).  Appellate courts review claims of instructional error *de novo* to determine whether the instruction was supported by the evidence and the law.  Powderly v. S. Cnty. Anethesia Assoc., 245 S.W.3d 267, 276 (Mo.

30

App. E.D. 2008). "To reverse a jury verdict on the ground of instructional error, the party challenging the instruction must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction." Fleshner, 304 S.W.3d at 90-91.

However, in order to review the instructions, objections to them must be properly preserved in the trial court. Supreme Court Rule 70.03 states:

> Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Counsel need not repeat objections already made on the record prior to delivery of the instructions. The objections must also be raised in the motion for new trial in accordance with Rule 78.07.

Rule 70.03. Whereas Appellant argues now that DataVerify's verdict director suffers from "evidentiary deficiency" because experts did not opine that attorneys have a duty to inform their clients about discussions with opposing counsel, nor testify that Mr. Andres breached any standard of care by engaging in the conduct proposed in the third alternative claim of negligence in the instruction, Appellant did not raise this argument in the trial court. Instead, Appellant's argument to the court follows:

> As to the third paragraph of paragraph first, we believe that that again is confusing and misleading in that the evidence in the case is that the CBC lawyer indicated that the exhibit to the agreement would be the revenue multiplier that would be used in payment.
> There was no evidence to suggest that the CBC lawyer was trying to get a better deal or that his refusal would mean that no multiple would apply.
> I believe this should require a finding by the jury that the CBC lawyer somehow was trying to change the deal or somehow that the CBC lawyer's refusal therefore changed the intent of the deal. And I think there should be some sort of submission that the negligence of the defendant was allowing CBC to change the intent of the deal. And there's no evidence to suggest otherwise.

31

"In order to assign as error the giving or failure to give an instruction, a party 'must make *specific* objections to the giving or failure to give instructions before the jury retires to consider its verdict; the objections and grounds therefore must be stated *distinctly* on the record, and the objections must also be raised in the motion for new trial.'" Berra v. Danter, 299 S.W.3d 690, 702 (Mo. App. E.D. 2009) (citing Sparkman v. Columbia Mut. Ins. Co., 271 S.W.3d 619, 624 (Mo. App. S.D. 2008) (quoting Doe v. McFarlane, 207 S.W.3d 52, 74 n.12 (Mo. App. E.D. 2006)). "When the point on appeal contends that an instruction is erroneous on a different ground than was asserted in the objection made at trial, we may not review that error on appeal." Berra, 299 S.W.3d at 703. Appellant did not raise its objection in the trial court that the third paragraph of Instruction No. 6 was unsupported by expert testimony regarding the standard of care. Thus, it cannot be raised on appeal, and therefore we refuse to review Appellant's sixth point on appeal.

Nevertheless, Appellant cannot show prejudice resulting from the submission of the third alternative basis for a finding of negligence because Appellant's expert witness, Judge Close, conceded that Mr. Andres was negligent. Judge Close was asked, "You testified about Mr. Andres and standard of care. Your opinion is that Mr. Andres did breach the standard of care and was negligent in 2007?" Judge Close answered, "There's no question he was negligent in 2007."

Given Appellant's concession, we note Appellant's alleged error cannot show prejudice. Appellant's Point VI is denied.

**D. Post-Judgment Interest Void**

Finally, in Point VII, Appellant alleges the trial court erred in amending the judgment to include an award of post-judgment interest pursuant to Mo. Rev. Stat. Section 408.040 because

the amended judgment was entered after the court had lost jurisdiction over the case, in that (1) the original judgment was entered November 12, 2014; (2) the original judgment did not award post-judgment interest and there is nothing in the record to indicate that the court intended to include such and award; (3) neither party filed a post-trial motion asserting that the court erred in failing to award post-judgment interest; and (4) the amended judgment was entered January 6, 2015, after the expiration of the 30-day period during which the court retained jurisdiction over the judgment pursuant to Supreme Court Rule 75.01.

The interpretation of a Missouri statute is a question of law that this Court reviews *de novo*. Kivland v. Columbia Orthopaedic Grp., LLP, 331 S.W.3d 299, 311 (Mo. banc 2011). When there are no factual disputes, the application of a statute is also reviewed *de novo*. Billings v. Div. of Emp't Sec., 399 S.W.3d 804, 806 (Mo. banc 2013). Additionally, the rules of the Supreme Court of Missouri are reviewed *de novo* because "'[t]his Court interprets its rules by applying the same principles used for interpreting statutes.'" In re Hess, 406 S.W.3d 37, 43 (Mo. banc 2013). When only legal issues are at stake, this Court reviews the trial court's judgment *de novo*. McGuire v. Kenoma, LLC, 447 S.W.3d 659, 662 (Mo. banc 2014). In reviewing an issue *de novo*, we do not defer to the trial court. Kelly v. Bass Pro Outdoor World, L.L.C., 426 S.W.3d 675, 678 (Mo. App. E.D. 2013).

The record shows that the trial court entered judgment on the jury verdict on November 12, 2014, assessing the damages of plaintiff, DataVerify, at $10,500,000, payable by defendant Appellant. The judgment did not refer to post-judgment interest, and the transcript is void of references to the same. On December 11, 2014, Appellant filed its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. At the end of the motion, Appellant requested "any other and further relief as this court deems just and proper." No

written motion from DataVerify appears in the legal file.  On December 29, 2014, the trial court denied Appellant's motion.  On January 6, 2015, the trial court filed its Amended Judgment, stating that counsel for plaintiff and defendant request an amendment to the judgment previously entered, and ordering post-judgment interest to accrue pursuant to Section 408.040 at the rate of 5.25 percent per annum.  Notice of appeal was filed on January 7, 2015.

DataVerify argues both it and Appellant requested an amendment to the judgment previously entered in this case, and that Appellant cannot rely on invited error on appeal. Essentially, DataVerify argues that the parties made an authorized after-trial motion to amend the judgment, which extended the jurisdiction of the court until ninety days from the date the last timely motion was filed or the date of ruling of the last motion to be ruled.  Rule 81.05(a)(2).[3] We disagree.

Section 408.040, RSMo (2000), provides for post-judgment interest.  The purpose of the statute is "to compensate a judgment creditor for the judgment debtor's delay in satisfying the judgment pending the judgment debtor's appeal."  Moore v. Bi-State Dev. Agency, 132 S.W.3d 241, 243 (Mo. banc 2004).  Even though mandated by statute, the award of post-judgment interest must be included in the original judgment to which it applies or in a timely amendment to that judgment.  Peterson v. Discovery Prop. & Cas. Ins. Co., 460 S.W.3d 393, 413 (Mo. App. W.D. 2015) (citing McGuire v. Kenoma, LLC, 447 S.W.3d 659, 666-67 (Mo. banc 2014)).

---

[3] For purposes of finality of judgments,
> If a party timely files an authorized after-trial motion, the judgment becomes final at the earlier of the following:
>
> (A) Ninety days from the date the last timely motion was filed, on which date all motions not ruled shall be deemed overruled; or
>
> (B) If all motions have been ruled, then the date of ruling of the last motion to be ruled or thirty days after entry of judgment, whichever is later.

Rule 81.05(a)(2).

To address Appellant's contention that the trial court erred in amending the judgment to include an award of post-judgment interest because the court had lost jurisdiction over the case, we look to Rule 75.01, which states, in relevant part:

> The trial court retains control over judgments during the thirty-day period after entry of judgment, and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time. Not later than thirty days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party, and every order granting new trial shall specify the grounds therefor. After the filing of notice of appeal and before the filing of the record on appeal in the appellate court, the trial court, after the expiration of such thirty-day period, may still vacate, amend or modify its judgment upon stipulation of the parties accompanied by a withdrawal of the appeal.

Rule 75.01.

"A trial court is . . . empowered to amend, vacate, reopen or modify upon its motion for [thirty] days after entry of judgment." In re Marriage of Cochran, 340 S.W.3d 638, 646 (Mo. App. S.D. 2011) (citing Carter v. Carter, 901 S.W.2d 906, 911 (Mo. App. 1995) (citing Rule 75.01)). When a party files an authorized post-trial motion, the period within which a trial court is empowered to amend its judgment is extended to ninety days. Id., citing Rule 73.01 and Rule 81.05. "Following the expiration of the initial thirty-day period, however, the trial court is limited to acting upon the range of remedies suggested in the parties' post-trial motions." In re Marriage of Cochran, 340 S.W.3d at 646, citing Carter, 901 S.W.2d at 911.

The issue here was discussed by this Court in Antonacci v. Antonacci, 892 S.W.2d 365, 368 (Mo. App. E.D. 1995), in the context of a dissolution case, L.J.S. v. V.H.S., 514 S.W.2d 1, 10 (Mo. App. 1974). In L.J.S., after the trial court entered judgment granting dissolution, the father filed a timely motion for new trial focusing on the excessiveness of the support award. Id. More than thirty days after the trial court's judgment, the trial court, on its own motion, amended the judgment by awarding the mother alimony and attorney's fees. Id. The mother did not file a

post-trial motion and father's motion did not seek additional awards against her.  Id.  The father,

on appeal, claimed the trial court exceeded its jurisdiction by amending the original judgment.

Id.  The court agreed, noting the following:

> The power of a court to correct, amend, vacate, reopen or modify a judgment
> upon its own motion (and for good cause) is limited to thirty days after entry of
> the judgment.  After that thirty-day period the court's jurisdiction is limited to
> granting relief sought by one of the parties in its after trial motions for reasons
> stated in that motion. (internal citations omitted).

Id., citing Wiseman v. Lehmann, 464 S.W.2d 539, 543 (Mo. App. 1971).  The appellate court

held that the relief granted in the amended judgment was void because it was not requested in the

father's post-trial motion.  Id.; see also State ex rel. Chemical Dynamics, Inc. v. Luten, 581

S.W.2d 921, 923 (Mo. App. E.D. 1979) (the post-trial motions alleged that the judgment was

inconsistent with the evidence adduced at trial but did not request a receiver; the court's order

appointing a receiver was void).

Also instructive to our analysis, in McGuire, the trial court's initial judgment after a jury

verdict did not include post-judgment interest or include an applicable interest rate as prescribed

in Section 408.040.  447 S.W.3d at 662.  The plaintiffs did not file a timely post-trial motion to

request the inclusion of post-judgment interest, seek to amend the judgment, or file an appeal

claiming error in the judgment.  Id.  The judgment was affirmed on appeal without consideration

of the un-raised issue of post-judgment interest.  Id.  After the mandate issued, the plaintiffs filed

a motion in the trial court – more than a year after the original judgment was entered – requesting

post-judgment interest.  Id.  In that motion, the plaintiffs sought post-judgment interest by way of

an amendment *nunc pro tunc* of the now final judgment so that the plaintiffs could receive

interest retroactive to the date that judgment was entered on the verdict.  Id.  The defendant

appealed from the granting of that motion.  Id.  On appeal, our Supreme Court considered

36

whether the trial court erred in entering its *nunc pro tunc* judgment on the ground that the failure to determine the post-judgment interest rate was a substantive error, such that *nunc pro tunc* was not an appropriate remedy.  Id.

Following McGuire, the Western District in Peterson, determined that an interest award pursuant to Section 408.040 must be made in the original judgment, pursuant to a timely amendment following a Rule 78.07 motion, pursuant to Rule 75.01, or even pursuant to a *nunc pro tunc* where there is evidence in the record that that trial court intended to include an interest rate or order payment of interest at the time the judgment was entered.  460 S.W.3d at 413. Therefore, the court found that because the plaintiffs did not assert error or timely seek amendment to the consent judgment in Peterson, it was improper for the trial court in the equitable garnishment action to amend the consent judgment to the original action to reflect interest not awarded therein.  Id.

Although Appellant filed a motion to amend the judgment within thirty days of the original judgment, and thus, filed an authorized after-trial motion in accordance with Rule 78.04,[4] Appellant did not make a specific request for post-judgment interest.  We have no record of a motion filed by DataVerify making such request for post-judgment interest.  The trial court stated in its amended judgment only that both parties requested an amendment.

The trial court's power was limited to correct, amend, vacate, reopen or modify its November 12, 2014 judgment upon its own motion (and for good cause) to thirty days after entry of the judgment.  Because the asserted error regarding post-judgment interest was not raised in the parties' post-trial motions filed with the court, the trial court was not authorized to grant relief of post-judgment interest after the initial thirty-day period ended from the date of the original

---

[4] Rule 78.04 states, "Any motion for new trial and any motion to amend the judgment or opinion shall be *filed* not later than thirty days after the entry of judgment. . . ." (emphasis added).

37

judgment.  We find the amended judgment awarding post-judgment interest, without having such request in an authorized post-trial motion, untimely, and therefore void.

Appellant's Point VII is granted.  We reverse the trial court's amended judgment and remand with instructions that the trial court void its amended judgment granting post-judgment interest.

### III.  Conclusion

The judgment of the trial court is affirmed in part and reversed in part.  The case is remanded to the trial court with instructions to void its amended judgment awarding post-judgment interest.

ROY L. RICHTER, Judge

Robert G. Dowd, Jr., P.J., concurs
Mary K. Hoff, J., concurs

38