

# SUPREME COURT OF MISSOURI
# en banc

BRIAN NAIL,                                      )
                                                 )
        Appellant,                               )
                                                 )
v.                                               )        No. SC93543
                                                 )
HUSCH BLACKWELL SANDERS, LLP,                    )
                                                 )
        Respondent.                              )
                                                 )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Sandra C. Midkiff, Judge

*Opinion issued June 24, 2014*

### Introduction

Brian Nail appeals from the trial court's entry of judgment in favor of Husch

Blackwell Sanders, LLP[1] in a legal malpractice action. Prior to this case, Husch

Blackwell represented Nail in a dispute with his former employer over his stock options.

Nail had options to purchase the employer's stock within 18 months after the termination

of his employment, but, when his former employer merged with another company, the

stock was "locked up" for 12 months after the merger. The value of the stock declined

significantly during the lockup period. Husch Blackwell eventually negotiated a

---

[1] This firm is now known as "Husch Blackwell LLP."

1

settlement that extended Nail's option period, but when Nail attempted to exercise his options under the settlement agreement, complications arose that prevented him from immediately obtaining the stock.

Nail later sued Husch Blackwell for legal malpractice, alleging that Husch Blackwell (1) negligently advised him regarding his remedies in the dispute with his employer; and (2) negligently drafted the settlement agreement. He sought to recover the highest value of the stock during the lock-up period, or, alternatively, the amount of the settlement agreement's liquidated damages clause. The record does not show, however, that the decline in the value of Nail's stock options was a reasonable or probable result of Husch Blackwell's allegedly deficient advice. Nor does it show that Nail's employer would have agreed to include provisions in the settlement agreement that would have allowed Nail to receive liquidated damages, and there was no evidence that the employer would have then breached any such provisions. Accordingly, the trial court's judgment is affirmed because Nail failed to prove that Husch Blackwell's alleged negligence caused his claimed damages.

## Factual and Procedural Background

As the chief financial officer of MTW Corporation, Nail acquired options to purchase stock in the company from its owner, Richard Mueller. When his employment was terminated in March 2001, he negotiated a separation agreement that permitted him to exercise his stock options until September 2002. The separation agreement provided that if MTW merged with another corporation, Nail's stock options would be converted into options to purchase stock in the successor company.

2

In July 2001, MTW was acquired in a stock-for-stock merger by The Innovation Group ("TIG"), a United Kingdom corporation with stock traded on the London Stock Exchange. The merger converted Nail's options to purchase MTW stock into options to purchase shares of TIG stock. As a condition of the merger, Mueller agreed to "lock up" his shares of TIG stock for one year, during which time he could not sell or transfer TIG stock without board approval. This included the stock to which Nail held options.

Nail learned of the MTW-TIG merger shortly before it became final, and he retained Husch Blackwell[2] for advice on how to protect his stock option rights. Husch Blackwell first asked TIG's board of directors to approve Nail's exercise of his stock options, but it refused. Nail and his attorneys then had several discussions regarding his possible courses of action. Nail knew he always had the option to sue. According to Nail, however, Husch Blackwell consistently advised him that litigation was unlikely to be successful, and he should attempt to settle with Mueller.

In March 2002, on Husch Blackwell's advice, Nail attempted to exercise some of his stock options. Mueller refused to transfer the stock, and Husch Blackwell threatened litigation. Shortly thereafter Nail and Mueller entered into a settlement agreement under which Mueller agreed to extend the option period by five years, place the shares Nail had options to purchase in an escrow account, and give Nail a $50,000 credit toward the exercise of his options. In return, Nail released Mueller from liability for breach of the separation agreement. Under the settlement agreement, Mueller was required to deliver a

---

[2] For convenience, this opinion refers to Husch Blackwell and the attorneys involved in this case collectively as "Husch Blackwell." Husch Blackwell does not dispute its liability for the actions of the attorneys who represented Nail.

transfer notice at the expiration of the lock-up period, which would place the shares of TIG stock Nail had options to purchase in escrow. Once the transfer notice was delivered, Nail would be free to exercise his stock options. To ensure Mueller's compliance, the settlement agreement included a liquidated damages clause, which provided that Mueller's failure to timely deliver the transfer notice would result in damages equal to the highest value of TIG stock during the remainder of the lock-up period without regard to the cost of exercising the options. The settlement agreement also required Mueller to execute and deliver any other documents necessary to transfer the stock.

Meanwhile, the price of TIG stock rose following the merger and then declined. From a price of about 2.9 Pounds per share (roughly $4) at the beginning of the lock-up period in July 2001, the stock price rose above 4 Pounds (more than $6) in August 2001. The stock price rapidly declined in October 2001, falling below 2 Pounds (less than $3). It rebounded in November and December 2001, approaching 4 Pounds per share (about $5), but in February 2002 it began a steady decline. In March 2002, when Nail and Mueller entered the settlement agreement, the stock was trading at 2.4 Pounds per share (about $3.50), and when the lock-up period expired in July 2002, the stock price had fallen below 1 Pound (approximately $1). The price remained low during Nail's extended exercise period and never rose above above 1 Pound before the period expired.[3]

---

[3] Nail and Husch Blackwell disagree on the precise value of TIG stock on each of the dates in question. The record is reviewed in the light most favorable to the party against whom summary judgment was entered. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993). Accordingly, the values set forth above are those provided

When the lock-up period ended, Mueller timely delivered the transfer notice, and Nail used his $50,000 credit to purchase TIG shares. To complete transfer of the stock, however, the London Stock Exchange required Mueller to deliver a stock transfer form, and Nail was required to pay a stamp duty. Mueller promptly delivered the necessary form, but Nail objected to the $285 stamp duty and refused to pay it. The stock was not registered in Nail's name until he paid the stamp duty nearly two years later.[4]

Nail later sued Husch Blackwell. He alleged that the law firm was negligent in two respects. First, he argued that Husch Blackwell negligently advised him regarding his remedies for Mueller's interference with his stock option rights because it failed to advise him to tender an exercise of his options immediately following the MTW-TIG merger. According to Nail, this failure caused damages equal to the difference between the highest value of the stock during the lock-up period and what it would have cost him to acquire the stock, which amounted to several million dollars.[5] Second, Nail argued that Husch Blackwell negligently drafted the settlement agreement by failing to require Mueller to place all of the documents necessary to transfer the stock in escrow at the end

by Nail. The parties generally agree, however, that the price of TIG stock initially increased during the lock-up period, reaching its zenith in August 2001, and then fell below its pre-lock-up period value for the remainder of the lock-up period and Nail's extended exercise period.

[4] Nail later retained different counsel and sued Mueller. He initially sought either: (1) to set aside the settlement agreement and obtain damages for breach of the separation agreement; or (2) to obtain damages under the settlement agreement's liquidated damages clause because the transfer notice was ineffective. He ultimately abandoned his first claim, and his second claim failed, largely because Mueller promptly provided the additional documents required by the London Stock Exchange. Nail and Mueller reached a second settlement giving Nail another $50,000 credit toward the exercise of his options.

[5] Nail claims damages in excess of $17 million. This figure is based on a peak stock value of more than $6, plus interest. Nail had options to purchase more than 2.1 million shares of TIG stock: approximately 1.85 million shares at $.3129 per share, and about 265,000 shares at $1.43 per share, for a total cost of just under $1 million.

of the lock-up period. Nail claimed that this failure caused him to lose a liquidated damages claim against Mueller worth millions of dollars.[6]

Husch Blackwell moved for summary judgment. The trial court initially granted summary judgment on Nail's first claim, holding that Nail failed to prove that Husch Blackwell's alleged negligence caused the harm for which he sought to recover.[7] It also granted partial summary judgment on Nail's second claim, finding that Husch Blackwell was not liable for the amount of the liquidated damages clause, but it denied summary judgment to the extent that Nail could prove he was damaged when his exercise of stock options was delayed until Mueller submitted the stock transfer form. After Nail stipulated that he suffered no harm during this time period, the trial court entered a judgment for Husch Blackwell. This appeal follows.[8]

### Standard of Review

Summary judgment is proper when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Rule 74.04. A "defending party" may establish a right to summary judgment by showing (1) facts that negate any of the claimant's necessary elements; (2) that the claimant, after an adequate period of

---

[6] The settlement agreement's liquidated damages clause provided for damages in an amount equal to the highest value of the stock during the remainder of the lock-up period. According to Nail, the highest value for TIG stock during this time was 2.45 Pounds, or approximately $3.48 per share. Multiplied by the 2.1 million shares on which Nail held options, this would have yielded more than $7 million in liquidated damages.

[7] The trial court also held that summary judgment was appropriate because Nail had waived this claim when he abandoned his breach of contract claim against Mueller in the earlier litigation. Because summary judgment is appropriate on the issue of causation, the waiver argument need not be addressed.

[8] This Court granted transfer after an opinion by the court of appeals. Mo. Const. art. V, sec. 10.

discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of the facts required to support the movant's properly pleaded affirmative defense. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993). Because the propriety of summary judgment is an issue of law, review is essentially *de novo*, and the trial court's judgment may be affirmed on any basis supported by the record. *Id.* at 376, 387-88.

**Analysis**

Nail asserts two legal malpractice claims against Husch Blackwell. In his first claim, he argues that Husch Blackwell negligently advised him regarding his remedies for Mueller's interference with his stock option rights, and that this negligence caused damages equal to the difference between the highest value of the stock during the lock-up period and his cost to acquire the stock. In his second claim, Nail argues that Husch Blackwell negligently drafted the settlement agreement, and that, but for its negligence, he would have had a liquidated damages claim against Mueller.

Both claims require Nail to prove "(1) that an attorney-client relationship existed; (2) that defendant acted negligently or in breach of contract; (3) that such acts were the proximate cause of the plaintiff['s] damages; [and] (4) that but for defendant's conduct the plaintiff[] would have been successful in prosecution of their underlying claim." *Donahue v. Shugart, Thomson & Kilroy, P.C.*, 900 S.W.2d 624, 626 (Mo. banc 1995). Because each claim is grounded in separate facts, they will be examined in turn.

7

## Negligent Advice Claim

Nail first contends that Husch Blackwell negligently advised him of his remedies after Mueller agreed to lock up his stock in the wake of the MTW-TIG merger. According to Nail, he informed Husch Blackwell that the sole purpose of its representation of him was to protect his stock option rights, and they had several discussions regarding his possible courses of action. Husch Blackwell did not, however, advise him of the need to exercise his stock options until March 2002, long after the merger. Nail's expert, John Tollefsen, opined that a reasonable attorney would have advised Nail to exercise his stock options immediately after the merger, and Husch Blackwell's failure to do so was negligent. Tollefsen reasoned that Nail should have been advised to exercise his stock options immediately because: (1) he had to exercise them to establish Mueller's breach of the separation agreement; and (2) exercising the stock options would fix his damages at the difference between what he could have sold the stock for on the date he exercised his options and his cost to acquire the stock. In addition, according to Tollefsen, exercising his options as early as possible was risk-free: exercise would create a breach, fix damages at the time of exercise, and if the share price went up, Nail could recover the gain in a claim for unjust enrichment.[9]

Husch Blackwell disputes Nail's allegations of negligence. The litigation in this case, however, has focused on the issue of causation. Like all negligence actions, legal

---

[9] The trial court did not decide the merits of the legal arguments embedded in Tollefsen's opinion, and the parties have not briefed these issues. This Court expresses no opinion as to the merits of these arguments.

malpractice requires proof of causation. *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 244 (Mo. banc 1984). Proof of causation entails proof of causation in fact, or "but-for" causation, as well as proximate causation. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862, 865 (Mo. banc 1993). In legal malpractice cases, causation in fact requires proof that, "but for" the attorney's negligence, the result would have been different. *Donahue*, 900 S.W.2d at 626. This is often called proving a "case within a case" or a "trial within a trial." 4 R.E. MALLEN & J.M. SMITH, LEGAL MALPRACTICE § 37:25, at 1708-09 (2014 ed.); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 53 cmt. b (2000). The plaintiff must also prove proximate causation, or that the injury was a reasonable and probable consequence of the defendant's negligence. *Donahue*, 900 S.W.2d at 626; *Callahan*, 863 S.W.2d at 865.

In legal malpractice cases, causation in fact and proximate causation are often both subsumed within the "case within a case." By proving that the result of the underlying proceeding would have been different "but for" the attorney's negligence, the plaintiff also proves that the damages—the difference between what the result *would have been* and what it *was*—were the reasonable and probable consequence of the defendant's negligence.

Nail's claim, however, is a novel one. Nail argues that Husch Blackwell was negligent in failing to advise him to exercise his stock options immediately after the MTW-TIG merger. He claims to have suffered damages equal to the highest value of the stock during the lock-up period minus the cost of exercising his options. The connection between the alleged negligence and the claimed harm is attenuated. Mueller, not Husch

9

Blackwell, prevented Nail from exercising his stock options during the lock-up period. To connect Husch Blackwell's alleged negligence to his claimed harm, Nail argues that, if he had exercised his stock options immediately after the MTW-TIG merger, he would have established a breach of contract claim against Mueller that would have allowed him to recover based on the highest value of the stock during the lock-up period. He further hypothesizes that he would have realized the value of that claim by either prevailing in a breach of contract lawsuit against Mueller or settling with him.

Assuming that this theory would satisfy the "but-for" test for causation in fact, it is nevertheless insufficient to establish proximate causation. Proximate cause requires more than mere causation in fact because "the 'but for' test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage." *Callahan*, 863 S.W.2d at 865. The general test for proximate cause is whether the claimed injury is the natural and probable consequence of the defendant's alleged negligence. *Id.* Proximate cause inquires into the scope of foreseeable risk created by the defendant's act or omission. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. banc 2001), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013). The causal connection cannot be based on speculation or conjecture. *Stanley v. City of Independence*, 995 S.W.2d 485, 488 (Mo. banc 1999). Each case must be decided on its own facts. *Krause v. U.S. Truck Co., Inc.*, 787 S.W.2d 708, 710 (Mo. banc 1990).

Although Nail casts his damages claim as compensation for the amount he would have recovered in a breach of contract lawsuit, a careful parsing of his claim demonstrates that, in reality, Nail seeks to recover for the decline in the value of his stock options during the lock-up period. Nail's theory of negligence is that Husch Blackwell failed to advise him of the legal consequences of exercising his stock options. Yet, in reality, Husch Blackwell did precisely what Nail claims it should have done. In March 2002, Husch Blackwell advised Nail to partially exercise his stock options as a preliminary to settlement negotiations. The difference, of course, is that Husch Blackwell advised Nail to exercise his options in March 2002 rather than July 2001. But the delay itself did not impair Nail's stock option rights. It did not prevent him from exercising his stock options, nor did it directly affect his remedies. The lock-up period imposed by Mueller prevented Nail from exercising his stock options, and even with the delay Nail was still able to establish facts to support a breach of contract claim against Mueller, which he ultimately settled for an extension of his stock option rights.

What changed between July 2001 and March 2002 was the price of TIG stock, and, therefore, the value of Nail's stock options. But the decline in the stock price was caused by the vicissitudes of the market, not Husch Blackwell's alleged negligence. Even if Husch Blackwell negligently advised Nail, it could not affect the market conditions that caused the stock's value to decline any more than it could predict them. A decline in the stock price is outside the scope of harms that would naturally, probably, and foreseeably result from Husch Blackwell's alleged negligence, and the causal

11

relationship between that negligence and TIG's stock price is not even conjectural—it is nonexistent.

This conclusion is supported by the decisions of other courts that have considered whether the client in a professional malpractice suit can recover for losses caused by the market. The holdings in *Movitz v. First National Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998); *First Federal Savings & Loan Ass'n v. Charter Appraisal*, 724 A.2d 497 (1999); and *Oregon Steel Mills v. Coopers & Lybrand, LLP*, 83 P.3d 322 (Or. 2004), are instructive.

In *Movitz*, the plaintiff had invested in commercial real estate in Houston based partly on the defendant bank's negligent evaluation of the property. When the Houston real estate market collapsed, the property went into foreclosure and sold for just over half the purchase price. The plaintiff lost its entire investment, and it sued the bank to recover for its loss. The court held that even though the plaintiff might not have invested in the property but for the bank's negligence, the bank was not liable for its loss because the market collapse wiped out the investment. As the court noted, "The care that the bank was contractually required to take in advising [plaintiff] with regard to the purchase of the office building was not intended to prophesy or avert market fluctuations but to make sure that the building was a sound purchase under current market conditions." *Movitz*, 148 F.3d at 763. The court suggested that the bank might have been liable for losses caused by its negligence—for example, for the cost of correcting structural deficiencies the bank negligently failed to discover—but the extent of the market collapse far exceeded the amount of the plaintiff's investment.

12

Similarly, in *Charter Appraisal*, the plaintiff made a loan secured by real property after the defendant appraiser negligently overvalued the property. The borrower later defaulted, and the plaintiff foreclosed. By that time, real estate values in the area had declined by more than 25 percent, and the plaintiff was left with a large deficiency judgment. It sued the appraiser seeking to recover damages for its loss. The court allowed the plaintiff to recover damages for the portion of the deficiency that represented the difference between the property's appraised value and its actual value at the time of the loan was made. It excluded from the damages award, however, the portion of the deficiency attributable to the market decline because "a fall in market values was not within the scope of risk created by the negligently conducted appraisal." *Charter Appraisal*, 724 A.2d at 607.

In *Oregon Steel Mills*, the plaintiff, a steel company, was delayed in making a stock offering when its accounting firm discovered that it had negligently approved the company's financial statements for a previous year. The accounting firm refused to approve an audit of the company's financial statements until the error was corrected, which delayed the offering by about a month. In the meantime, market conditions depressed the price of stock in steel companies, including the plaintiff's stock, and the plaintiff's stock ultimately sold for less than it would have if the sale had not been delayed. The company sued the accounting firm for the loss caused by changes in the market price, but the court held that these losses were not recoverable because they were not a foreseeable consequence of the firm's negligence. The court noted that it was foreseeable that an accounting firm's negligence could affect its client's stock price, but

the damages plaintiff sought were "based solely on the decline in the price of plaintiff's stock" even though "the price decline affected all steel stocks and was unrelated to defendant's misconduct." *Oregon Steel Mills*, 83 P.3d at 344.

Nail's claim is analogous to the claims in *Movitz*, *Charter Appraisal*, and *Oregon Steel Mills*. In each case, the plaintiff had something of value—in Nail's case, it was a right to purchase certain shares of stock at a certain price—but its value depended almost entirely on the market. And in each case, the harm to the plaintiff's value came from the market, not from the defendant's negligence. This is not to say that an attorney's negligence may never be the proximate cause of a decline in his or her client's stock price. But like *Movitz* and *Oregon Steel Mills*, no part of Nail's claimed damages represents losses caused by Husch Blackwell's negligence. He seeks to recover solely for the decline in the stock's value, which was caused entirely by the market. As a matter of law, the risk of a decline in Nail's stock price was not a reasonable or probable consequence of Husch Blackwell's alleged negligence. Accordingly, the trial court properly granted summary judgment on Nail's negligent advice claim.

**Negligent Drafting Claim**

Nail's claim that Husch Blackwell negligently drafted the settlement agreement also fails for lack of causation. This time, however, he fails to make the threshold showing of causation in fact. In a nutshell, Nail's theory of negligence is that the settlement agreement should have required Mueller to place *all* of the documents necessary to transfer the stock into escrow upon the expiration of the lock-up period; that

14

it did not; and this failure was negligent. He further contends that this failure prevented him from being able to enforce the settlement agreement's liquidated damages clause.

Again, Husch Blackwell disputes Nail's allegations of negligence. But assuming that Nail offered sufficient evidence that Husch Blackwell negligently drafted the settlement agreement, he must still show that, but for its negligence, he would have had a liquidated damages claim against Mueller. To do this, he must prove that Mueller would have agreed to include the necessary provisions in the settlement agreement and then later would have breached them. *See Bryant v. Bryan Cave*; 400 S.W.3d 325, 331 (Mo. App. 2013); *Steward v. Goetz*, 945 S.W.2d 520, 532-33 (Mo. App. 1997); *Lange v. Marshall*, 622 S.W.2d 237, 239 (Mo. App. 1981). Assuming Husch Blackwell had included language in the settlement agreement requiring Mueller to provide the transfer documents required by the London Stock Exchange, Mueller would have had to agree to these provisions. Mueller would also have had to agree to provide those documents at the same time as the transfer notice—immediately upon the expiration of the lock-up period—and not insist on a different time requirement. Moreover, Mueller would have had to agree to make his non-compliance with these provisions subject to the liquidated damages clause. And then, after he had agreed to all of these things, Mueller would then have had to ignore his obligations under the settlement agreement and subject himself to millions of dollars in liquidated damages. This is all pure speculation.

Nail has not offered any evidence that Mueller would have agreed to any of these provisions or that he then would have breached them. Most importantly, Nail's hypothesis that Mueller ultimately would have breached the settlement agreement is

15

belied by the undisputed facts of the case. In reality, Mueller scrupulously complied with his obligations under the settlement agreement, and he promptly provided the additional documents required by the London Stock Exchange upon Nail's request. There is nothing in the record to suggest that he would not have done so if the settlement agreement had been drafted as Nail argues it should have been—especially when his failure would have subjected him to millions of dollars in liquidated damages.

Nail argues alternatively that Husch Blackwell's negligence in drafting the settlement agreement diminished the value of his stock options. In his view, the settlement agreement's failure to require Mueller to place all of the documents necessary to transfer the stock into escrow subjected him to the risk of delay any time he exercised his options. He still must prove, however, that but for Husch Blackwell's negligent drafting the result would have been more favorable. As with his first argument, Nail must prove that Mueller would have agreed to the relevant provisions, and he has offered no evidence on this point. He must also prove that he would have realized a greater profit on his stock options if these provisions had become part of the settlement agreement. *Steward*, 945 S.W.2d at 532-33. To the contrary, Nail stipulated that no damages were caused when his first exercise was delayed pending Mueller's delivery of the stock transfer form, and he concedes that he eventually exercised nearly all of his stock options and realized profits in excess of $600,000. He offered no evidence that, but for the risk

16

of delay presented by Husch Blackwell's alleged negligence, he would have exercised more of his stock options or realized more profit.[10]

Nail failed to prove that, but for Husch Blackwell's allegedly negligent drafting, he would have obtained a more favorable outcome. Accordingly, the trial court did not err in entering summary judgment for Husch Blackwell on this claim.

## Conclusion

The trial court's judgment is affirmed.

_____
Mary R. Russell, Chief Justice


Fischer, Stith, Draper, Wilson
and Teitelman, JJ., concur.
Breckenridge, J., not participating.

---

[10] Nail argues that, if Husch Blackwell's alleged negligent drafting diminished the value of his stock options, the measure of damages should be the amount of the liquidated damages clause because that amount was a reasonable prediction of the harm caused by interference with his options. This argument is out of step with the established measure of damages in legal malpractice claims, which is the amount the client would have received but for the attorney's negligence. *Thiel v. Miller*, 164 S.W.3d 76, 82 (Mo. App. 2005). Further, he must still demonstrate that he would have been better off if Husch Blackwell had drafted the settlement agreement as he argues it should have. *Donahue*, 900 S.W.2d at 626. Nail complains that the settlement agreement created a risk of delay that diminished the value of his stock options; he must prove, therefore, that, but for this risk, he would have realized greater profit. His claim fails because he did not make the required showing.

17