

# Missouri Court of Appeals

## Southern District

### Division One

PREMIUM INVESTMENTS, LLC, )
)
    Plaintiff-Appellant, )
)
v. )    No. SD34662
)    Filed: April 30, 2019
LOWTHER JOHNSON, ATTORNEYS )
AT LAW, LLC, )
)
    Defendant-Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Laura J. Johnson, Special Judge

**<u>AFFIRMED</u>**

Premium Investments, LLC (Premium) appeals from a judgment in favor of Lowther Johnson, Attorneys at Law, LLC (Lowther Johnson) in a legal malpractice action. The trial court granted summary judgment to Lowther Johnson on two grounds: (1) Premium could not prove causation; and (2) the applicable statute of limitations had expired. Because the trial court's ruling on the causation element was correct, we affirm.[1]

---

[1] We may affirm a summary judgment on any appropriate theory supported by the record, so it is unnecessary to address the limitations issue. *See **Piatt v. Indiana Lumbermen's Mut. Ins. Co.**,* 461 S.W.3d 788, 790 (Mo. banc 2015).

**Standard of Review**

A summary judgment shall be granted "[i]f the motion, the response, the reply and the sur-reply show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" Rule 74.04(c)(6); *Schnurbusch v. W. Plains Reg'l Animal Shelter*, 507 S.W.3d 675, 679 (Mo. App. 2017).[2] "Facts come into a summary judgment record *only* via Rule 74.04(c)'s numbered-paragraphs-and-responses framework." *Jones v. Union Pac. R.R. Co.*, 508 S.W.3d 159, 161 (Mo. App. 2016) (italics in original). Thus, when reviewing a summary judgment, we review the undisputed material facts established by the process set forth in Rule 74.04(c). *Alvis v. Morris*, 520 S.W.3d 509, 511-12 (Mo. App. 2017). "We view the record in the light most favorable to the non-moving party, drawing all inferences in that party's favor." *Progressive Max Ins. Co. v. Hopkins*, 531 S.W.3d 649, 651 (Mo. App. 2017); *see also Lindsay v. Mazzio's Corp.*, 136 S.W.3d 915, 920 (Mo. App. 2004).

As a defending party, Lowther Johnson can establish a right to summary judgment by showing: (1) facts negating any one of the claimant's elements facts; (2) the claimant, after an adequate period of discovery, has been unable, and will not be able, to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) the undisputed facts support each of the necessary elements of the defending party's properly pleaded affirmative defense. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993). "Each of these three means establishes a right to judgment as a matter of law." *Lindsay*, 136 S.W.3d at 920. Because

---

[2] All references to rules are to Missouri Court Rules (2018).

the propriety of summary judgment is purely an issue of law, we review the grant of a summary judgment *de novo*. *Id*. at 919.

## Factual and Procedural Background

As noted above, our summary of the facts is drawn from the statements of uncontroverted material fact established by the Rule 74.04(c) paragraph-and-response framework. *Alvis*, 520 S.W.3d at 512; *see Huskey v. Queen City Roofing & Contracting Co.*, 523 S.W.3d 610, 617-18 (Mo. App. 2017).

Rib Crib BBQ, Inc. (Corporate) is the franchisor of the Rib Crib restaurant concept. Bold Ribs Company, LLC (Bold Ribs) was organized in 2002 to own Rib Crib franchised restaurants. Bold Ribs eventually became the majority owner of seven Rib Crib franchised restaurants, including one in Rogers, Arkansas.

Rogers Bold Ribs, LLC (RBR) was organized in 2004 to own and operate the Rib Crib franchise in Rogers. In July 2004, RBR, as tenant, leased real property in Rogers (the Property) from landlord Pizza Ventures, Inc. (Pizza Ventures) to operate a Rib Crib franchise restaurant. The lease, a mandatory addendum and an amendment were collectively referred to as the "Master Lease" for the Property. Bold Ribs executed a guaranty of the Master Lease. The mandatory addendum was executed by Corporate, Pizza Ventures and RBR. The Master Lease provided for a 15-year term, ending in November 2019.

In February 2006, Premium purchased the Property from Pizza Ventures. Premium entered into an assignment and assumption of the Master Lease from Pizza Ventures. The obligation to pay rent was the responsibility of RBR, as guaranteed by Bold Ribs. RBR began paying rent directly to Premium that month. When the Property was purchased, Premium knew the Master Lease contained a provision granting the tenant the unconditional

3

right to assign the lease, or to sublease the property, without the landlord's consent. If the tenant decided to assign or sublease, the Master Lease also required the landlord to provide, upon the lessee's request, an estoppel certificate (Certificate) confirming that: (1) the Master Lease was in full force and effect; (2) the tenant was current on rent and other charges; and (3) the tenant was not in default or subject to any claims by the landlord.

During 2006, RBR was struggling financially. By late 2006, Bold Ribs wanted to sell RBR. Bold Ribs negotiated with another established franchise operator, but no agreement was reached. Premium was told that RBR was struggling financially, and efforts were made by Bold Ribs and RBR to involve Premium in a solution to RBR's financial issues.

In September 2007, Corporate agreed to purchase RBR and other assets of Bold Ribs via an asset purchase agreement (APA). In this APA, however, Corporate was unwilling to accept a full assignment of the RBR lease because of its terms. Premium was not willing to negotiate a lower rent rate. Negotiations on this issue continued, and RBR continued to pay rent to Premium through January 2008.

In January 2008, the parties negotiated an amendment to the APA. Pursuant to this amendment: (1) RBR and Bold Ribs agreed to sublease the Rogers' location to Corporate; and (2) Corporate agreed to pay the obligations of the Master Lease, but only for a minimum of two years.[3] The amendment also specified that, "in the event that landlord consent was not required that [Bold Ribs] should deliver landlord's [Certificate] in a form reasonably approved by [Corporate]." Under the terms of the Master Lease, Premium was obligated to

_____

[3] The sublease was for the remaining duration of the lease, but it gave Corporate the right to terminate the sublease upon six months' notice after 18 months had elapsed.

4

provide the Certificate upon RBR's request. On January 25, 2008, the Certificate was prepared for the sublease of RBR and emailed to Premium for signature. Upon receipt of the Certificate, Premium gave it to Lowther Johnson to review. Premium failed to timely sign and deliver the Certificate as requested.

The APA closing occurred on February 1, 2008. As of that date, no signed Certificate for the Property had been provided by Premium. In lieu thereof, Bold Ribs agreed to indemnify Corporate for any loss arising from the absence of the Certificate. As of the date of the closing: (1) RBR was current on its rent; (2) it owed no money to Premium; (3) RBR was not in default; and (4) Premium had no claims against RBR or any other party based upon the terms of the Master Lease. Corporate executed the sublease with RBR on February 1, 2008. The signed Certificate for the Property was not delivered by Premium until February 18, 2008. The Certificate was in the format required by the lease and indicated that all obligations under the Master Lease were current as of the end of January 2008.

Following the APA closing, Bold Ribs paid off debts, and neither Bold Ribs nor RBR had any remaining assets. Corporate began paying rent for the Property directly to Premium. In January 2009, Corporate vacated the property. Premium learned that the Property was vacant in late January or early February 2009. Premium listed the Property for rent on February 9, 2009. Corporate continued to pay rent through January 2010. The Property was ultimately leased, on less favorable terms and rent rate than the Master Lease, to another lessee in June 2013.

On October 29, 2009, Premium filed suit against Bold Ribs and RBR for breach of the Master Lease, Bold Ribs' guaranty of the Master Lease, and other tort and equitable theories of recovery (hereinafter referred to as rent action). Premium amended its petition

to add Bold Ribs' principle Michael Treadwell (Treadwell), manager Brandon Robertson (Robertson) and Corporate as parties.[4] Premium settled with Corporate, and it was dismissed from the case. A bench trial of the rent action took place in September 2014 in the circuit court of Greene County. The court heard testimony from several witnesses, including Premium principal Richard Morsovillo (Morsovillo) and defendants Treadwell and Robertson.

In October 2014, the court entered judgment against Bold Ribs and RBR for breach of the Master Lease and guaranty in the amount of $1,538,728.86, plus interest. The court found in favor of defendants Treadwell and Robertson. The court also denied relief on all of the other theories of recovery in Premium's amended petition. The judgment included 212 factual findings relating to the issues raised in the rent action petition. Following entry of this judgment, Premium was unable to collect any money from Bold Ribs or RBR.

In December 2014, Premium filed this lawsuit (hereinafter referred to as the malpractice action) against Lowther Johnson for the advice allegedly rendered to Premium concerning "the implications of the [Certificate.]" Premium alleged that Lowther Johnson "failed to inform Mr. Morsovillo": (1) "about the possibility that [Corporate] might not have taken a full assignment of the Master Lease, but rather, might have merely subleased the Property"; (2) "that additional research might be needed to determine whether [Corporate] was taking a full assignment"; (3) that "absent a full assignment of the Master Lease, [Premium] might not receive all of the revenue it was entitled to under the Master Lease"

---

[4] The petition and amendments thereto also alleged: (1) conspiracy to breach the Master Lease; (2) violation of the Uniform Fraudulent Transfer Act; (3) breach of implied covenant of good faith and fair dealing; (4) fraudulent misrepresentation and omissions; (5) negligent misrepresentation and/or omissions; and (6) claims to pierce the corporate veil of Bold Ribs and RBR.

6

and (4) that "an equitable action to enjoin the APA closing" should have been filed.[5] Lowther Johnson denied these allegations in its answer.

Thereafter, Lowther Johnson filed a motion for summary judgment. The motion was accompanied by a statement of 65 uncontroverted facts, almost all of which mirrored factual findings by the judge in the rent action judgment.[6] In Premium's response, it admitted 63 of these facts.[7] As for the remaining two, the response was that the hypothesized fact did not exactly track the stated fact in the judgment. Premium also hypothesized three additional controverted material facts:

1. If Lowther Johnson had told Premium that Corporate was only taking a sublease, Premium would have sought to negotiate better sublease terms with Corporate.

2. Absent a satisfactory negotiation, Premium would have filed suit to halt the transaction, learned about the prior negotiation and improved Premium's bargaining position or forced a sale to another party for more than Corporate paid.

3. Absent a negotiation of better lease terms or a better forced sale, Premium would have taken steps to begin searching for a new tenant while the Property was still occupied, thereby significantly reducing its damages.

---

[5] According to Premium, this "equitable action" would have allowed Morsovillo to learn that another buyer had made a "better offer" and thereby protected Premium's interest in the Master Lease, forcing Corporate to either "match" the higher offer or "accept a full assignment of the Master Lease" and, if not, allowing the other buyer to purchase the property, resulting in assets being available to satisfy the loss sustained by Premium in the breach of the Master Lease.

[6] Paragraph 63 of Lowther Johnson's statement of uncontroverted facts, which Premium admitted, noted that a true and accurate copy of the judgment was attached.

[7] To be clear, although each mirrored fact specifically referenced the corresponding finding in the rent action judgment for record support, as required by Rule 74.04(C)(1), each such stated fact was nevertheless asserted without qualification as a material fact in this action. Further, Premium's unqualified admissions established those statements as facts in this case, rather than merely admitting they were factual findings in the rent action judgment.

7

In Lowther Johnson's reply, it responded to the above statements by arguing that they were speculation or conjecture, rather than facts which could be used to support or oppose a summary judgment motion. All three paragraphs were denied, with supporting references to the record. Lowther Johnson also submitted a statement of seven additional uncontroverted material facts that were admitted by Premium.

Lowther Johnson argued, *inter alia*, that it was entitled to summary judgment because: (1) Premium had no choice but to provide the Certificate; (2) the transaction closed without the Certificate; and (3) there was nothing Premium could have done to stop the sale of RBR by Bold Ribs to Corporate.[8] According to Lowther Johnson, it was entitled to judgment as a matter of law because: (1) the material facts established through the summary judgment process cannot be re-litigated by Premium; and (2) these facts show Premium cannot prove the causation element of its legal malpractice claim. The trial court agreed and entered summary judgment for Lowther Johnson on that ground.[9] This appeal followed.

**Discussion and Decision**

The four elements of a legal malpractice action are: "(1) an attorney-client relationship; (2) negligence or breach of contract by the defendant; (3) proximate causation of plaintiff's damages; [and] (4) damages to the plaintiff." *Klemme v. Best*, 941 S.W.2d 493, 495 (Mo. banc 1997). A defendant moving for summary judgment may establish a

---

[8] Lowther Johnson pointed out that "there was no other buyer." In the rent action, the trial court found that the manager of Bold Ribs had negotiated with another buyer, "but no agreement was reached."

[9] As noted in n.1, *supra*, we need not address the separate statute of limitations ground that was also presented in Lowther Johnson's motion.

right to judgment as a matter of law by demonstrating that the plaintiff "cannot and will not be able to prove one or more elements of [its] claim." *Highfill v. Hale*, 186 S.W.3d 277, 280 (Mo. banc 2006). "Failure to prove any one of these elements defeats a claim for legal malpractice." *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 545 (Mo. App. 2016).

"Like all negligence actions, legal malpractice requires proof of causation." *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 562 (Mo. banc 2014); *see Collins v. Mo. Bar Plan*, 157 S.W.3d 726, 732 (Mo. App. 2005) (plaintiff must show "a causal connection between his or her attorney's negligence and the resulting injury"). Proof of causation entails proof of causation in fact, or "but-for" causation, as well as proximate causation. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862-65 (Mo. banc 1993). The preliminary question in legal malpractice actions is proof that, "but for" the attorney's negligence, the result would have been different. *Nail*, 436 S.W.3d at 562. Once this preliminary hurdle is met, then plaintiff must also prove proximate causation, or "that the injury was a reasonable and probable consequence of the defendant's negligence." *Id*. "By proving that the result of the underlying proceeding would have been different 'but for' the attorney's negligence, the plaintiff also proves that the damages – the difference between what the result *would have been* and what it *was* – were the reasonable and probable consequence of the defendant's negligence." *Id*. (italics in original).

Premium's point contends that the trial court erred in granting Lowther Johnson's motion for summary judgment when it determined that Premium could not meet the "but-for" and "proximate" causation element of its legal malpractice cause of action. Premium argues that "a genuine dispute exists regarding the facts surrounding these elements, in that

9

the doctrine of non-mutual defensive collateral estoppel does not preclude further litigation of these disputed facts[.]" According to Premium, this doctrine does not apply because the causation element was "not fully litigated in the underlying case" because the prior judgment "makes no determination as to what Premium could have done had Lowther Johnson informed Premium of the factual significance on the sublease." We disagree.

Premium's argument about collateral estoppel is misdirected. During the summary judgment process below, Premium admitted virtually every one of the 72 material facts hypothesized by Lowther Johnson.[10] Material facts admitted by the nonmovant are established for purposes of a summary judgment motion. *See, e.g.*, ***Pemiscot Cty. Port Auth. v. Rail Switching Servs., Inc.***, 523 S.W.3d 530, 534 (Mo. App. 2017); ***Coonce v. Simons***, 520 S.W.3d 821, 823 (Mo. App. 2017). Based upon our review of these established facts alone, Premium cannot prove the causation element of its legal malpractice case. The premise of that action was that Lowther Johnson gave inadequate advice concerning the implications of the Certificate. The established facts, however, demonstrate that premise is false.

When the Property was purchased, Premium knew the Master Lease contained a provision granting the tenant the unconditional right to assign the lease, or to sublease the

---

[10] We do not consider the three "facts" hypothesized by Premium because, as Lowther Johnson stated in its response, these amount to nothing more than speculation or conjecture, which is insufficient to create a genuine issue of material fact for trial. *See*, *e.g.*, ***Higgenbotham v. Pit Stop Bar & Grill, LLC***, 548 S.W.3d 323, 328 (Mo. App. 2018) (a genuine issue is a real and substantial one – not merely conjecture, theory, or possibility); ***Rayman v. Abbott Ambulance, Inc.***, 546 S.W.3d 12, 16 (Mo. App. 2018) (a genuine dispute exists when the issue or dispute is a real and substantial one and does not consist merely of conjecture, theory and possibilities).

property, without Premium's consent. In the event of an assignment or sublease and at the lessee's request, the Master Lease also required Premium to provide the Certificate confirming that: (1) the Master Lease was in full force and effect; (2) the tenant was current on rent and other charges; and (3) the tenant was not in default or subject to any claims by the landlord. All of those conditions were met at the end of January 2008. Therefore, Premium had no choice but to provide the Certificate.

Additionally, Premium's failure to provide the Certificate in a timely manner did not prevent the closing. Instead, Bold Ribs agreed to indemnify Corporate for any loss arising from the absence of the Certificate. As already noted, Premium had no factual basis to refuse to provide the Certificate, and it was provided, in the required form, 18 days late. Accordingly, the absence of the Certificate at closing had no effect on the transaction whatsoever.

Finally, the established facts demonstrate that there was nothing Premium could have done to stop the sale of RBR by Bold Ribs to Corporate. Premium was told that RBR was struggling financially, and efforts were made by Bold Ribs and RBR to involve Premium in a solution to RBR's financial issues. Premium, however, was not willing to negotiate a lower rent rate. In September 2007, Corporate agreed to purchase RBR and other assets of Bold Ribs via an APA. Bold Ribs had negotiated with another entity, but no agreement was reached. Therefore, there was no "other buyer" who could have paid more than Corporate. This is in accord with the trial court's conclusion in the rent action:

> Defendants suggest that, even if [Premium] had understood the Rogers Lease would be subleased, there was nothing [Premium] could have done to interrupt that. The Court agrees. Defendant RBR had a contractual right to sublease. [Premium's] consent was not required. Mr. Morsovillo has suggested that had he known there would be a sublease he could have refused to sign the [Certificate]. Mr. Morsovillo overlooks or ignores the fact that

11

[Premium] was required by the contract to sign the [Certificate] at the request of the tenant. Likewise, in the end, Mr. Morsovillo did not timely sign the [Certificate] and the APA was closed, and the sublease entered, nonetheless. Mr. Morsovillo next suggested that had he known of the sublease he could have sued, although he never revealed what it was that he thought he could sue for. Mr. Morsovillo finally suggested that had he known of the sublease he could have immediately begun to re-lease the property. [Premium] overlooks the fact that the Rogers Lease was not in default, but was merely being subleased and [Premium] was expected to, and did, receive all of the lease consideration for at [least] a minimum of two more years. Simply put, there being no default, [Premium] would have no right to retake possession at that time.

This conclusion is further supported by these additional established facts: (1) Corporate vacated the property in January 2009; (2) Premium learned that the Property was vacant in late January or early February 2009; (3) Premium listed the Property for rent on February 9, 2009; (4) Corporate continued to pay rent through January 2010; and (5) the Property was finally leased, on less favorable terms and at a lower rent rate than the Master Lease, to another lessee in June 2013.

After considering the established facts in this case, the summary judgment record presents no genuine issue of material fact that warrants a trial. *See, e.g.*, *Aziz v. Tsevis*, 565 S.W.3d 738, 745 (Mo. App. 2018); *Walsh v. City of Kansas*, 481 S.W.3d 97, 108 (Mo. App. 2016).

Even assuming Premium's complaint about the use of the rent action findings of fact and conclusions of law was relevant to our review of the summary judgment record, our decision would not change. "Collateral estoppel, or issue preclusion, is used to preclude the relitigation of an issue that already has been decided in a different cause of action." *Brown v. Carnahan*, 370 S.W.3d 637, 658 (Mo. banc 2012). "The principle of *non-mutual* collateral estoppel, as adopted in Missouri, permits use of a prior judgment to preclude relitigation of an issue even though the party asserting collateral estoppel was not a party to

12

the prior case." ***James v. Paul***, 49 S.W.3d 678, 684 (Mo. banc 2001) (italics added). In determining whether non-mutual collateral estoppel will apply, courts consider first whether the doctrine is being applied offensively or defensively. ***Id***. at 685.[11] "Defensive collateral estoppel generally involves a defendant invoking the doctrine to prevent a plaintiff from relitigating a fact decided against the plaintiff in earlier litigation that is necessary for the plaintiff to establish and carry his burden of proof." ***Id***. Allowing such use defensively serves to prevent the potential of collusive litigation and to promote finality, consistency and judicial economy. ***Id***. at 688; *see, e.g.*, ***Rosenberg v. Shostak***, 405 S.W.3d 8, 15-16 (Mo. App. 2013) (non-mutual defensive collateral estoppel applied in legal malpractice case). Collateral estoppel applies only when: (1) the issue in the present case is identical to an issue decided in the prior adjudication; (2) the court in the prior adjudication rendered a judgment on the merits; (3) the party against whom collateral estoppel is asserted is the same party or in privity with a party in the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. ***State ex rel. Johns v. Kays***, 181 S.W.3d 565, 566 (Mo. banc 2006); ***James***, 49 S.W.3d at 682.

Premium's argument – that collateral estoppel does not apply because the causation element presented an issue (concerning "the factual significance of the sublease") that was not fully litigated – challenges only the fourth prong required for collateral estoppel. This

---

[11] "[O]ffensive collateral estoppel normally involves the attempt by a plaintiff to rely on a prior adjudication of an issue to prevent the defendant from challenging a fact necessary to the plaintiff's case and on which the plaintiff carries the burden of proof. Generally speaking, courts have been less inclined to allow offensive use of the doctrine rather than defensive when mutuality of parties is lacking." ***James***, 49 S.W.3d at 685 (citation omitted).

13

argument fails because the legal and factual significance of the Certificate was fully litigated in the rent action. In that action, which involves both contractual and tort theories of recovery, the multitude of Certificate-related issues were thoroughly and vigorously litigated by Premium. Therefore, Premium had a full and fair opportunity to litigate the implications of the Certificate and the advice Premium received thereon in the rent action. The doctrine of collateral estoppel therefore applies here, given: (1) identical issues relevant to the present suit decided in the prior adjudication; (2) that adjudication rendered a judgment on the merits; (3) the party against whom collateral estoppel is asserted is the same party in the prior adjudication; and (4) that party had a full and fair opportunity to litigate the issue in the prior suit. *See James*, 49 S.W.3d at 682; ***Rosenberg***, 405 S.W.3d at 15-16.

The findings in the rent action with respect to the Certificate, which are now part of the facts established via the summary judgment process, demonstrate that Premium cannot satisfy the causation element of its legal malpractice claim. In the rent action, the trial court found that: (1) Premium was required under the Master Lease to provide the Certificate; (2) the Certificate did not in any way affect the APA; and (3) the transaction closed without the signed Certificate. Thus, the Certificate had absolutely no effect on the underlying sale transaction. Premium cannot prove that, "but for" Lowther Johnson's allegedly negligent advice, the result would have been different. *See Nail*, 436 S.W.3d at 562. Because this preliminary hurdle has not been met, Premium also cannot prove proximate causation, i.e., that its injury is the reasonable and probable consequence of the attorney's negligence. ***Id***.; *see **Steward v. Goetz***, 945 S.W.2d 520, 532-33 (Mo. App. 1997) (plaintiff failed to show causal connection as there was no evidence connecting any damages to the actions of the attorney). Absent Premium's ability to prove the element of causation required for its

14

malpractice claim, Lowther Johnson is entitled to judgment as a matter of law. *See **Highfill***, 186 S.W.3d at 282.[12] Accordingly, the trial court did not err by entering summary judgment in Lowther Johnson's favor. Point denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

GARY W. LYNCH, J. – CONCUR

MARY W. SHEFFIELD, P.J. – CONCUR

---

[12] Premium's point goes on to argue that "a genuine issue of material fact exists as to how Premium's damages could have been mitigated had Lowther Johnson explained the factual significance of the [Certificate.]" Because Premium failed to show the element of causation in its legal malpractice claim, we do not reach any issue concerning the element of damages. *See **SKMDV Holdings, Inc.***, 494 S.W.3d at 545 (failure to prove any one element defeats a claim for legal malpractice); *see, e.g.*, ***Rosenberg***, 405 S.W.3d at 18-19 (affirming summary judgment in favor of attorneys based solely on plaintiff's inability to show causation; attorneys' advice simply too far removed from plaintiff's damages to constitute their proximate cause).